W. HUNT, ADM'R ET AL. V. S. A. WHITE, NEXT FRIEND, &C.

There cannot be, in this state, an implied manumission of a slave, in any of the modes known to the civil law, or the laws of those states where manumission may be effected without the observance of any legal formalities, and where there is no restriction upon the exercise of the power of manumission.

The bequest of property to a slave, cannot effect his emancipation in this state; because manumission, to take effect within the state, is contrary to its laws and public policy, which prohibit the introduction, or residence, of free negroes within its limits.

The rule, that parol contemporaneous evidence is inadmissible, to contradict or vary the terms of a valid written instrument, obtains as well in courts of chancery, as in courts of law. The case of wills, does not constitute an exception to this rule.

It is competent, to admit parol evidence, to explain a will (or other written instrument) by showing the situation of the testator in his relation to persons and things around him, or by proof of the surrounding circumstances, in order that his will may be read in the light of the circumstances in which he was placed at the time of making it.

The intent of the testator must be ascertained from the meaning of the *words* in the instrument, and from those words alone; but extrinsic evidence is admissible of such facts and circumstances as will enable the court to discover the meaning attached by the testator to the *words* used in the will, and to apply them to the particular facts of the case.

A court of equity will correct mistakes in a will, when they are apparent upon its face, or may be made out by a due construction of its terms.

An explanation, by the witnesses to a written will, at the time of probating it, by a recital of additional oral instructions, given by the testator in respect to his property, cannot be sustained as a nuncupative will.

ERROR from Jackson.  Tried below before the Hon. Fielding Jones.

This suit was commenced in the County Court, on the 31st of May, 1853, by a petition filed by James, Robert, and Thomas Bracken, Jane Boyd and Moses Boyd her husband, Elizabeth Kays and William Kays her husband, Abigail M'Gahey and Samuel M'Gahey her husband, (the said Thomas, James, Robert, Jane, Elizabeth and Abigail, being brothers and sisters, and heirs at law of William Bracken, deceased;) Mourning Vice, as

guardian of his minor children, by Polly his late wife, who was another sister and heir at law of William Bracken, deceased, and Fleming Vice, son of the said Polly, and of full age; Abigail, also a daughter of said Polly, who was joined by her husband Asbury How; Samuel and Essy Bird, children of Margaret Bird, deceased, who was a sister of said William, as the heirs at law of said deceased, William Bracken, for a partition and distribution of his estate.

The decedent died in Jackson county, leaving a written will, dated the 19th day of January, 1852, reduced to writing by N. B. Thompson, and subscribed by four witnesses, which was admitted to probate on the 29th day of March, 1852, and recorded.    At the time that the witnesses proved the will, they made oath in the Probate Court to an " explanation" of said will, which was ordered by the court, at the time of probating the will, to be attached thereto.  The written will was as follows, to wit:—

                    " Jackson county, State of Texas.
"In the name of God, amen!  I, William Bracken, being at present sick, though sound in mind and memory, have considered the frailness of mortality, do first commit my spirit to God, my body to the earth, and all my just debts to be paid by my executors and friends, John M'Henry, and N. B. Thompson.  I will and bequeath to Elizabeth Sneida, one thousand dollars, in cash, my adopted wife; also, one hundred head of average cattle, also all the household and kitchen furniture for the use of all the family.

"2dly.  That my son Charles be purchased, and all the balance of my effects equally divided between my son Charles, my daughter Amanda, and my daughter Harriet, my daughter Mary Sneida and Robert Sneida, and Eliza Sneida; the present crop to be completed and raised, cattle to be gathered next fall, and sold, after Elizabeth's are taken out.

" I will that my executors sell one-third of a league on the Chipidanis, being a joint interest with Edward Dwier and my-

self, next fall; also one-third on the Santa Clara, also a joint interest with Edward Dwier; also one-third on the San Antonio road, all of which is in Bexar county; also 1200 acres in Comal county, near New Braunsfel tract; also 2000 in Guadalupe county, above Seguin; all of which tracts, I wish my executors to sell at private sale, and that this my home, so much of it as is deemed necessary, be kept for my family homestead, until they arrive at maturity, or the youngest marry. I also will that all my home-place, not occupied by the family, be rented, and hands hired out.

"Now I do by these presents, lawfully constitute, commission, and appoint, and do by these presents convey, and possess with ample authority to settle up my business, in manner and form above named, the said John M'Henry and N. B. Thompson, to receive and receipt, and carry out in all respects, this my last will and testament; and by these presents constitute the said John M'Henry and N. B. Thompson my legally constituted attorneys in law. In testimony whereof, I have hereunto affixed my hand and seal, this the 19th of January, 1852.

"Attest,  WILLIAM BRACKEN, [SEAL.]

"M. D. Box,

"JOHN J. EWERS,

"CHARLES COLEMAN,

"PETER WHITE."

The "explanation" referred to was as follows:—

"The State of Texas, county of Jackson,

"Probate Court, March Term, 1852.

"This day personally appeared in open court, Charles Coleman, John J. Ewers, M. D. Box, and Peter White, who, after being sworn, stated, individually, that they were present at the residence of William Bracken, deceased, during his last sickness, and that they were called upon to witness his will, bearing date the 19th day of January, A. D. 1852; and the said Bracken died the next day after executing the said will, which has been proved by us, and admitted to probate. That during his said last sick-

ness, and at the time of making said will, the said testator gave full and perspicuous instructions and directions to the writer of said will, in our presence, and to our full understanding. The particulars of said instructions, do not appear therein, or appear ambiguous; we, therefore, now come into court, as the friends of the deceased, and state that the writing witnessed by us, and admitted to probate under our affidavit, does not fully show the desires and often-expressed intentions of said testator, and that the full, forcible, and reiterated expressions, directions and desires, for the disposal of his estate, may be shown, set forth, and perpetuated, we make the following declaration, which we wish to be recorded and attached to the will aforesaid, as an explanation thereto, and as a statement of the particulars, to wit:

"The testator, William Bracken, had three children which he acknowledged and owned before us. They are the parties in said will mentioned, as Charles, Amanda and Harriet, who are part African blood; the two latter living with him at his homestead, the former, the property belonging to the estate of James Kerr, deceased. He emphatically directed his executors to purchase said Charles, and to take him, and his two sisters to a state of the United States where they can be emancipated; that they provide for their education, and that when they are of legal age, they should have an equal share of his estate, with his other children; such portion remaining until that time, in the hands of his executors. That the other parties in said will mentioned, to wit, Mary Sneida and Robert Sneida and Eliza Sneida, were acknowledged by said testator, as his own proper children, and that he wished them to be so considered, and to inherit his property as such."

This was duly sworn to, and subscribed by the said witnesses, at the March Term, 1852.

At the June Term of the County Court, 1853, on hearing of the application for a partition and distribution of the estate, it was adjudged that that portion of the will which bequeathed property to Charles, Amanda and Harriet, be set aside, as null, void, and of no effect, for the reason that there was proof suffi-

cient that Charles was a slave, belonging to the estate of James
Kerr, deceased, and that Amanda and Harriet were slaves, be-
longing to the estate of William Bracken, deceased. It was
further adjudged that, as the will devised all the testator's estate
to Charles, Amanda, and Harriet, and three others, viz., Mary,
Robert, and Eliza Sneida, and as the three first mentioned
could not hold under the will, one-half of the estate was not
devised, and should descend and vest in the heirs at law. The
court thereupon proceeded to render the appropriate decree for
such partition and distribution, according to the interests of the
legatees and heirs, as above defined, and having regard to the
other specific bequests and dispositions of the will.

On the 29th of November, 1853, Amanda, Harriet and Charles,
by N. B. Thompson, as their next friend, filed a petition in the
District Court for a *certiorari*, to review the proceedings and
judgment of the Probate Court, in which they sought to sus-
tain their claim to freedom, and to the bequests in their favor,
by virtue of the will aforesaid, with the explanation made
thereto.

The petition alleged that, at the time of making the said will,
the testator was confined to his bed, unable to write; and the
will was, therefore, written by the said N. B. Thompson, at the
testator's dictation. That it was difficult to write the words
dictated, as fast as they were spoken, and in consequence there-
of, words were unintentionally omitted, which would have ren-
dered the intention of the testator more clear. By an amend-
ment, the plaintiffs alleged that the said omissions resulted from
accident or mistake, and that the explanation attached to the
will contained the bequests and directions of the testator, which
had been thus omitted.

The plaintiffs admitted that they were the children of a
slave and of the testator, and that they were slaves for life; and
the petition set forth the contents of the written will and the
" explanation," and the proceedings had in the Probate Court,
and made the executor of the will and the heirs at law of the
testator, parties defendant.

The defendants filed a general demurrer, and also set forth causes therefor. S. A. White was, during the progress of the suit, substituted as next friend in the stead of N. B. Thompson; and John M'Henry, executor, having resigned, Wilkins Hunt, administrator with the will annexed, was made defendant.

The cause was submitted to the court, (a jury being waived,) on the pleadings and the record of the County Court, and it was adjudged that the decree of the County Court, so far as it affected the liberty or *status* of the plaintiffs, or affected or made void the will of the testator, and so far as it ordered a distribution of the property devised to the plaintiffs amongst the heirs at law, be reversed and annulled. And it was decreed, that the property by the said will devised to the plaintiffs, Charles, Amanda and Harriet, be vested in, and placed in the hands of the trustee by the decree appointed, to be by him disbursed and paid over to the said plaintiffs, in the manner specified therein. The decree made appropriate provision and authority for the purchase of Charles, and his removal with Amanda and Harriet to a state in which the laws permitted freedom to be given to slaves; and empowered the trustee to take the proper steps to accomplish that purpose.

*W. S. Glass* and *Phillips & Phillips*, for the appellants.

*S. A. White*, for the appellees.

WHEELER, C. J.—It is not questioned, that by the law of this state, in order to effectuate the manumission of a slave by will, provision must be made for the removal of the slave out of the state. This was the conclusion deduced from an examination of our constitution and laws upon this subject, in the case of Purvis v. Sherrod, 12 Texas Rep. 140; and its correctness is not controverted. A re-examination of that question is therefore unnecessary. And it results, that there cannot be, in this state, an implied manumission of a slave, in any of the modes known to the civil law, or the laws of those states where manu-

mission may be effected without the observance of any legal formalities, and there is no restriction upon the exercise of the power of manumission.   (Cobb on Slavery, ch. 21, § 380.)

The bequest of property to a slave, cannot operate his emancipation in this state; because manumission, to take effect within the state, is contrary to its laws and public policy, which prohibit the introduction or residence of free negroes within its limits.   The will here in question, contains no clause expressly manumitting these slaves.   The intention to manumit, can be derived only by implication, from the bequest to them of property, and some expressions in the will, which seem to contemplate their continued residence in the state, in the enjoyment of freedom and property.   But these provisions cannot be held to effectuate their freedom, being in contravention of the laws and declared public policy of the state.

"In several of the states," says Mr. Cobb, in his Treatise on Slavery, p. 290, § 344, "domestic manumission, that is, manumission to take effect within the state, is prohibited, the increase of free negroes being declared against their policy.   Of course, all deeds or wills attempting to manumit, in opposition to such policy, are *pro tanto* void.   But even in these states, it is allowed by deed or will, to provide for the immediate transfer of the slaves to some other state or country, where manumission is allowed, for the purpose of being there emancipated.   If, however, the provision is made for a future emigration for that purpose, it would be void; it being in contravention of that public policy, to increase the number of *statu liberi* within the limits of the state."

This will contains no provision for the removal of the slaves out of the state; but on the contrary, seems to contemplate their remaining in the state, in the enjoyment of freedom.   In so far it is in contravention of law, and consequently void.

It is not contended, that the written will effectuates the manumission of these slaves; but it is insisted, that they are entitled to their freedom, by virtue of the parol "explanation," by the witnesses to the will, which accompanied its probate and regis-

42

tration in the County Court; and the question is, whether the
omission in the will to provide for the emancipation of the tes-
tator's slaves, can be thus supplied by parol.

It is insisted, that it can be, in the exercise of the equitable
powers of the court, to grant relief in cases of accident and
mistake, and that the court may reform the will, so as to make
it express the intention of the testator, as deposed to by the
witnesses. But it must be observed, that the power of a court
of chancery to grant relief in cases of mistake in written in-
struments, does not go to the extent of adding to or changing
the nature and legal import of the writing. That would be to
contravene the rule, which obtains as well in courts of chancery
as in courts of law, that parol contemporaneous evidence is in-
admissible, to contradict or vary the terms of a valid written
instrument. The case of wills does not constitute an exception
to the application of this rule.

This subject is very fully treated of by Mr. Jarman, in his
Treatise on Wills, (vol. 1, ch. 14,) where it is shown, by refer-
ence to numerous authorities, that the doctrine is well settled,
that the courts will not permit parol evidence to be adduced,
either to contradict, add to, or explain the contents of a will;
and the principle of this rule, (it is said,) evidently demands an
inflexible adherence to it, even where the consequence is the
partial or total failure of the testator's intended disposition.
Mr. Jarman adds : "No principle connected with the law of wills
is more firmly established, or more familiar in its application,
than this; and it seems to have been acted upon by the judges,
as well of early as of later times, with a cordiality and steadiness,
which show how entirely it coincided with their own views."
" Thus, (among many instances,) in the case of Strode v. Lady
Falkland, letters and oral declarations of the testator being
offered, to prove the intention to include a reversion, in the words,
' all other my lands, tenements, and hereditaments, out of set-
tlement,' it was unanimously agreed by the Lord Chancellor,
(COWPER,) Lord Chief Justice, and Master of the Rolls, that
this kind of evidence could not be admitted ; for that, where a

will was doubtful or uncertain, it must receive its construction from the words of the will itself; and no parol proof or declaration ought to be admitted, out of the will, to ascertain it." (1 Jarman on Wills, 350.) And in entire accordance with this are all the authorities. Accordingly, it has been laid down, that extrinsic evidence of intention, as an independent fact, is inadmissible, for the purpose of filling up a total blank in a will; or of supplying a devise, or any other material provision, term, or qualification, omitted by mistake; and that, for this purpose, the clearest oral declarations of intent, are inadmissible. (2 Cow. & Hill's notes to Phil. Ev., n. 271, to p. 313; 2 Phil. Ev. ch. 7, § 2.) "*A fortiori*, parol evidence is not admissible to supply any clause or word which may have been inadvertently omitted by the person drawing or copying the will." (1 Jarman on Wills, 353; 2 Phil. Ev. ch. 7, § 2.)

It is needless to multiply authorities, in support of a doctrine so elementary and familiar. It is competent to admit parol evidence, as it is sometimes though not very accurately expressed, to explain a will, (or other written instrument,) by showing the situation of the testator, in his relation to persons and things around him; or, as it is often expressed, by proof of the surrounding circumstances; in order that his will may be read in the light of the circumstances in which he was placed at the time of making it. His intent must be ascertained from the meaning of the words in the instrument, and from those words alone. But as he may be supposed to have used language, with reference to the situation in which he was placed, to the state of his family, his property, and other circumstances relating to himself individually and to his affairs, the law admits extrinsic evidence of those facts and circumstances, to enable the court to discover the meaning attached by the testator to the words used in the will, and to apply them to the particular facts of the case. For this purpose, every material fact that will enable the court to identify the persons or things mentioned in the instrument, is admissible, in order to place the court, whose province it is to deter-

mine the meaning of the words, as near as may be, in the situation of the testator, when he used them in making his will.

Thus, it is said by Mr. Wigram: " For the purpose of determining the object of a testator's bounty, or the subject of disposition, or the quantity of interest intended to be given by his will, a court may inquire into every material fact relating to the person who claims to be interested under the will, and to the property which is claimed as the subject of disposition, and to the circumstances of the testator, and of his family and affairs, for the purpose of enabling the court to identify the person or thing intended by the testator, or to determine the quantity of interest he has given by his will. The same, (it is conceived,) is true of every other disputed point, respecting which it can be shown, that a true knowledge of extrinsic facts can, in any way, be made ancillary to the right interpretation of a testator's words." (Wigram on Wills, 53, 3d ed.) In this way, extrinsic evidence may aid in arriving at the intention of the testator, by showing in what sense he employed the language he has used in his will; and for this purpose, that is, to enable the court to understand the meaning of the words in the instrument, parol evidence is admissible; but never for the purpose of proving other language declaring his meaning, than that which is contained in the instrument itself. That would be, in the language of a learned authority, (2 Phil. Ev. 305,) " inconsistent with the rule which reason and sense lay down, and which has been universally established for the construction of wills, namely, that the testator's intention is to be collected from the words used in the will, and that words which he has not used cannot be added." (And see 1 Greenl. Ev. § 288, et seq.)

" In regard to mistakes in wills, (says Judge STORY,) there is no doubt, that courts of equity have jurisdiction to correct them, when they are apparent upon the face of the will, or may be made out by a due construction of its terms." " But then, the mistake must be apparent on the face of the will, otherwise, there can be no relief." There is no mistake apparent on the face of the will in this case; none that can be made out by a due con-

struction of its terms; and it manifestly is not a case for relief in equity, on the ground of mistake or accident. The will is complete in itself, and formal in its execution. What is proposed by the parol evidence is, to add to the will an independent substantive bequest, and to make it speak upon a subject on which it is altogether silent. It is not proposed to call in extrinsic evidence, to enable the court to arrive at the meaning of the testator's language, used in the will itself, but to introduce into the will an intention not apparent upon its face, and different from that which the language used imports, by the proof of other language, not contained in the will: in effect, to make a new devise for the testator, which he is supposed to have omitted, and not quite consistent with that he has made. The effect of the admission of such evidence, would be, that the will, though made and executed with the requisite legal solemnities, by the testator, in his lifetime, would really and in fact, be made by the witnesses, after his death. It is unnecessary to advert to the danger of admitting such evidence. It is sufficient, that there is no authority for it in the law; that it would destroy all the guards intended to be secured by the statute of frauds, and the statute concerning wills, for the prevention of frauds and perjuries; and would contravene the clearest and best established principles and rules of law.

The parol "explanation" cannot be sustained as a nuncupative will, if it were competent to emancipate a slave by such a will. It is not pretended, that the testator made more than one will. That cannot be both a written and nuncupative will; or partly written and partly nuncupative. It is one or the other; it cannot be both. It was duly probated as a written will. As such it must stand or fall. It has been decided in one case, in Kentucky, that a paper not perfected as a written will, may be established as a nuncupative will, where its completion was prevented by the act of God. (Offutt v. Offutt, 3 B. Monr. 162.) This case was referred to by the Supreme Court of Pennsylvania, in the case of Porter's Appeal, 10 Barr, 254, and it was supposed to have depended much on the peculiarity of the Ken-

tucky statute. But there is no case which decides that the same testamentary disposition may be established, both as a written and nuncupative will; or that omissions in a written will may be supplied, by proving the omitted matter as a nuncupative will. That would contravene the rule we have considered, which excludes parol evidence of other language declaring the intention of the testator, than that which is contained in the will itself. Nuncupative wills are not favorites of the courts. The whole scope and policy of the law, it has been said, is, that when there is time, the will must be written; but when there is not time, a verbal disposition of the personal estate alone is allowed, in extremity. (10 Barr, 260.) Independently of the statute of frauds, the *factum* of a nuncupative will requires to be proved by evidence more strict than that of a written one, in every single particular. This is owing to the facilities with which frauds, in setting up nuncupative wills, are obviously attended. (1 Williams on Executors, 101.)

There was no intention, on the part of the testator, to make a nuncupative will. The witnesses were not called on to witness such a will. They were called to witness the written will. As was observed by the court, in a case before cited, (10 Barr, 260,) "if that was left incomplete by the wilfulness or ignorance of the scrivener, the courts cannot, therefore, make a nuncupative will, against the will of the deceased, and thereby let in a dangerous precedent upon society." Moreover, the proposed "explanation" was not probated as a nuncupative will. (Hart. Dig. Art. 3257, 3261.)

Our conclusion is, that there was no bequest of freedom to the appellees, which the well settled principles of law will authorize a court, either of law or equity, to recognize and enforce; and that the judgment of the court, overruling the demurrer to the petition, and giving judgment for the appellees, is erroneous, and must be reversed, and the cause remanded.

Reversed and remanded.