Opinion delivered April 27, 1888.

---

No. 5669.

PEET, YALE & BOWLING *v.* COMMERCE AND ERVAY STREET RAILWAY COMPANY.

1. CONSTRUCTION OF WILLS.—When a will clearly by its terms evidences that a different meaning is intended to be given to the use of words employed in expressing the testator's wish from that which would attach under a technical construction of the terms employed, the techni-

cal meaning will be disregarded and the testator's intention prevail. See opinion for facts illustrating the rule.

2. SAME.—Words used in a will must be considered with reference to the surroundings of the testator when the will was made, and extrinsic evidence touching the surroundings of the testator at the time with regard to his family property and himself is admissible to enable the court to discover the meaning intended to be conveyed by the terms employed in the will. This rule will not authorize parol evidence to contradict, add to or explain the contents of a will by showing declarations made by the testator, before, at the time, or subsequent to the execution of the will.

3. FACT CASE.—See opinion for facts held insufficient to impress on property possessed by husband and wife at the time of the wife's death the character of separate property of the wife.

4. EVIDENCE.—The testimony of the husband to the effect that property possessed jointly by himself and wife when she died was her separate property, can not control the legal effect which attaches to the detail of facts connected with its acquisition, which impress it with the character of community property.

APPEAL from Dallas. Tried below before the Hon. George N. Aldridge.

*H. G. Robertson* and *Wright, Wright & Eckford,* for appellants: The legal effect of the will set out in the answer is to vest the Commerce and Ervay Street property in her husband, H. W. Keller, absolutely, she having died without issue and the will having bequeathed the property to her legal heirs. (Construction of will: Revised Statutes, art. 1646, sec. 2; Mullins v. Thompson, 51 Texas, p. 7, point p. 10; 2 Phillips' Evidence, 305; 1 Greenleaf's Evidence, 288; Freeman v. Knight, 2 Ired., N. C., Eq., 72; McCabe v. Spruel, 1 Dev., N. C., Eq., 189; Corbill v. Corbill, 1 Jones, N. C., Eq., 114; Evans v. Godbolt, 6 Rich., S. C., Eq., 26; Martindale v. Warner, 15 Pa. St., 471. Parol testimony: Maulding v. Scott, 56 Am. Dec., 298; Templeton v. Walker, 55 Am. Dec., 647; Rawson v. Rawson, 52 Ill., 62; Richards v. Miller, 62 Ill., 417; Sharp v. Klempter, 7 La. Ann., 273; Williams v. Crary, 4 Wend., 443; Arther v. Arther, 10 Barb., 9.)

The court erred in permitting parol testimony for the purpose of showing what persons were intended by the testatrix in said will to take under it as shown by bill of exceptions number one. When the separate property of the wife has undergone mutations it is indispensible, in order to maintain its separate character, that it be clearly and indisputably traced and identi-

fied; when money has been invested it must be traced back to the separate estate not through indefinite channels and unknown changes but connectedly and plainly. (Epperson v. Jones, 65 Texas, 425; Mitchell v. Man, 26 Texas, 329; Huston v. Curl, 8 Texas, 239; Glasscock v. Hamilton, 62 Texas, 152; King v. Gilleland, 60 Texas, 274; Schmeltz v. Gorey, 49 Texas, 49; Chapman v. Allen, 15 Texas, 278; Love v. Robertson, 7 Texas, 6.)

*Leake & Henry,* for appellee: The words "legal heirs," when used in a will, mean the *next of kin,* and not the distributees, who in the absence of a will would take under the statute. (Tillman v. Davis, 95 N. Y., 17; Tillman v. Davis, 47 Am. Rep., 1; Drake v. Pell, 3 Edw'd Ch., 251; Wright v. Trustees, etc., Hoff. Ch., 202; Luce v. Dunham, 69 N. Y., 36; Lord v. Bourne, 63 Maine, 368; Lord v. Bourne, 18 Am. Rep., 234; Loving v. Thorndike, 5 Allen, 249–257.)

2. Where words in a will are equivocal, that explanation shall be given which will preserve consistency, in preference to one which would create inconsistency.

3. If possible, every provision in a will should be given effect, and to that end all parts of a will are to be construed in relation to each other.

4. Words occurring more than once in a will shall be presumed to be used always in the same sense, unless a contrary intention appear from the context.

5. Where a married woman devises to her husband a life estate in real estate, the remainder to her "legal heirs," the words "legal heirs" mean the next of kin; and when in another clause she devises property to her husband in trust for her legal heirs, there also the words "legal heirs" mean the next of kin.

6. Where all the provisions of a will, when construed together, show unmistakably that the testator used the words "legal heirs" in the sense of "next of kin," the court will give them that construction. (Lane v. Vick, 3 How., 464; Cook v. Weaver, 12 Ga., 47; Jackson v. Hoover, 26 Ind., 511; Parker v. Wasley, 9 Gratt., 477; Dalton v. Scales, 2 Ired. Eq., 521; Dill v. Dill, 1 Desari., 237; Mutter's Estate, 38 Penn. St., 314; Robertson v. Johnson, 24 Ga., 102; Downing v. Bain, 24 Ga., 372; Dugans v. Livingston, 15 Mo., 230; Tucker v. Ball, 1 Bart., 94; Eliot v. Carter, 12 Pick , 436; McEachin v. McRae, 5 Jones, N. C., 19; Gorsby v. Vance, 36 Miss., 564; Still v. Spear, 45 Pa., 168; Rose v. McHose, 26 Mo., 590.)

STAYTON, CHIEF JUSTICE. Appellants, being judgment cred-itors of H. W. Keller, caused a writ of garnishment to be served on the appellee, through which they seek to reach shares of stock in the company claimed to belong to Keller. The appel-lee denied having anything in its hands belonging to Keller, and the answer was controverted. The shares stand in the name of the wife of Keller, who died testate prior to the time the writ of garnishment was served.

There are two issues in this case: 1. It is claimed that Keller under the terms of his wife's will became the owner of the shares. 2. That the shares were owned in community by Kel-ler and wife and therefore subject to the payment of the debt, whether Keller took his wife's interest under her will or not.

Mrs. Keller died on May 17, 1883, leaving a will made but a few days before her death, and at the time of her death she left surviving neither child, children nor descendants, but left father, mother, brothers and sisters. By the will of Mrs. E. L. Keller she bequeathed to her husband, H. W. Keller, her half commu-nity interest in their homestead for life, "with remainder to my legal heirs."

By the third clause she says: "I give and bequeath to my beloved husband, in trust for my legal heirs, my street railroad property in the city of Dallas, known as the Commerce and Ervay Street Railroad, together with all stock, live and rolling, franchises and rights pertaining to the same, and direct that he superintend the management of the same,     *     *     *     *     *     *     *     *     * and after paying all expenses incidental to the running, maintaining and keeping said property in good condition, the remainder of the revenues derived from the man-agement of said property, I direct shall be paid over to my legal heirs, share and share alike, with remainder after my husband's death, or the relinquishment of said trust by him for any cause or reason whatever to my legal heirs."

The sixth clause bequeathed her furniture and her paintings and pictures to her husband absolutely.

The seventh clause appointed H. W. Keller executor, and authorized him to sell any of her property, and reinvest in any property or enterprise he may deem beneficial to her legal heirs.

The court held that under this will sixty-one shares of stock were held by H. W. Keller, not in his own right, but in trust for Mrs. Keller's legal heirs and that the same was not subject to garnishment as the property of H. W. Keller.

It is claimed by appellant, under the facts stated, that H. W. Keller took under the will as "legal heir."

Under the statutes regulating the descent and distribution of an intestate's separate estate, a husband, the wife leaving no child, children or their descendants, would take all of her personal estate and one-half of her realty without remainder to any person; and, if the wife leave neither father, mother, nor brothers or sisters or their descendants, then the husband would be entitled to her entire estate.

The proposition contended for by the appellants is, that by the term "legal heirs" the husband takes under the will the shares of stock in controversy, on the ground that as to such property the statute in case of intestacy makes the husband the legal heir.

For the purpose of this case it may be conceded that the words "legal heirs," nothing appearing to show that they were used in a will in a different sense, mean the person on whom the law casts title to property owned by an intestate and not next of kin; but can such a meaning be given to the words used in the will of Mrs. Keller when it is considered in its entirety? We think not. If the meaning which the testatrix intended should be given to the words "legal heirs" can be ascertained from the will itself, then such meaning they must bear, whether this be their technical meaning or not; and in arriving at the real intention of the testatrix we must look to her surroundings at the time of her death, for with reference to these she must be presumed to have used the language found in the will.

The paragraph in which she disposes of her interest in the homestead evidences that she did not include within the words "my legal heirs" her husband; for the estate which she devises to such heirs is only a remainder to be enjoyed after her husband's death.

The third paragraph, by which the parties concede that she intended to dispose of the shares of stock in controversy, the bequest to her husband was "in trust for my legal heirs," who are shown to have been the persons intended to be benefited by the legacy; for the net revenues resulting from the operation of the railway were to be paid to them by the trustee, share and share alike, so long as he should live or execute the trust, with remainder to the persons designated her "legal heirs," after her husband's death or such time as he should relinquish the trust. The word "remainder" used in this para-

graph of the will was evidently not used in its technical sense, but its meaning as used is obvious.

· The creation of the trust, the husband being made the trustee without being given any beneficial interest, with specific directions that the net revenues should be paid to persons who are designated as the legal heirs of the testatrix until the happening of one of two contemplated events should terminate the trust, one of which would occur at the very moment the life of the husband would cease, while the other might occur at any time, when the intended beneficiaries should take absolutely, forbid the holding that the testatrix intended that her husband should take as a legal heir.

The testatrix throughout recognized the fact that more than one person would take under this, the preceeding and seventh paragraphs of the will which could not have been had she intended him to take as legal heir; and the persons she intended should take, during the life time of her husband, were to receive, and from him as trustee, share and share alike.

· The seventh paragraph invests the husband with a naked power to be exercised in the sale of property belonging to the estate of the testatrix and in the reinvestment of the proceeds as he may deem beneficial to her legal heirs; a power unnecessary if it had been her intention to give the property to him. When the testatrix conferred upon her husband a right or power she did so by designating him as her "beloved husband, H. W. Keller" or her "beloved husband," and this is done in such connection as clearly to show that she did not intend to include him in the bequests made to the persons whom she designated as her legal heirs; for some of these bequests or devises were not to be fully enjoyed by the persons designated as legal heirs until the death of her husband.

We conclude that it was not the intention of the testatrix to give the shares in controversy to her husband in whole or in part, but to her relatives by blood—to her next of kin.

· The intention of a testator "must be ascertained from the meaning of the words in the instrument, and from these words alone. But as he may be supposed to have used language with reference to the situation in which he was placed, to the state of his family, his property and other circumstances relating to himself individually and to his affairs, the law admits extrinsic evidence of these facts and circumstances to enable the court to discover the meaning attached by the tes-.

tator to the words used in the will, and to apply them to the particular facts in the case." (Hunt v. White, 24 Texas, 652.)

Parol evidence, however, can not be introduced to contradict, add to or explain the contents of a will by proving declarations made by the testator before, at the time of or subsequently to the making of a will. The court should have excluded the evidence of declarations made by Mrs. Keller about the time the will was written as to the persons she intended should take under it. (Hunt v. White, 24 Texas, 651.)

The testatrix and H. W. Keller were married in the State of Mississippi in the year 1866, and it is claimed that the stock in controversy was bought with money or the proceeds of money she then had. No proof seems to have been offered as to the laws in force in the State of Mississippi at the time of the marriage, and if we assume them to have been the same in reference to the property rights of persons there contracting marriage as the laws in force in this State, then any property bought with money or the proceeds of money owned by Mrs. Keller at the time of her marriage was her separate estate, but the statute declares that "all the effects which the husband and wife possess at the time the marriage may be dissolved shall be regarded as common effects or gains, unless the contrary be satisfactorily proved." (Revised Statutes, 2853.)

The shares of stock in controversy were purchased during the marriage, and were possessed by the husband and wife at the time of her death, and from this it follows that the burden of proving that they were the separate property of Mrs. Keller rests upon the appellee.

The evidence bearing on this question is very loose and unsatisfactory. There is evidence tending to show that Mrs. Keller at the time of her marriage may have had something over three thousand dollars, which was invested in a house and furniture in the State of Mississippi that was afterwards sold and the proceeds sent to Texas and invested in some property here, but the evidence tends strongly to show that the most of the proceeds of this property was invested in the homestead disposed of by the will, and therein recognized to be community property. The homestead in Mississippi was shown to have been sold for three thousand dollars, and it is stated that this money was sent to Dallas, but whether so immediately after the sale is not made to appear. This is all the money which with any clearness is shown to have been the separate estate

of Mrs. Keller ever brought to Texas.    Yet we find that near the time this money is claimed to have reached Texas, her brother claims to have had in his hands some seven or eight thousand dollars, her separate means, of which he received four thousand two hundred dollars from J. L. Harris & Co., of New Orleans.    Whether the sum last named embraced the money received from the sale of the homestead in Mississippi is not made clearly to appear.

In reference to this matter H. W. Keller testified as follows: "She sold the homestead for three thousand dollars and the money was brought to Dallas.    I am not sure whether it all was put into Mr. Downs's hands or not.    I used some of the money for her, buying and speculating in cotton and shipping it to New Orleans.    The money went into the hands of J. L. Harris & Co. at New Orleans.    Some of it Harris & Co. sent to her, and they sent some of it to Mr. Downs here in Dallas.    That was in the spring of 1876, prior to our coming to Texas.    The money went to Downs in a check from New Orleans.    Sometimes I would buy drafts from parties and send them to New Orleans and make a few dollars that way.    We had no banking facilities then."

From this evidence the inference is almost irresistible that the money, in part at least, which is claimed to have been her separate property of Mrs. Keller, was money made in speculating in cotton that may have have been bought with her money.

We have seen that Downs received from Harris & Co. four thousand two hundred dollars, and that firm seems to have sent a further sum to Mrs. Keller.    Such evidence is not sufficient to trace separate property; on the contrary, it tends to show that a part of the money claimed to have been the separate property of Mrs. Keller was acquired in such way as to make it community under the laws of this State.    The broad statement of conclusions as to the character of the funds made by H. W. Keller can not override the legal conclusions that arise from the facts stated by him.

We have no disposition further to comment upon the evidence in this case; in fact, in view of another trial it would be improper to do so, but we feel constrained to hold that the evidence is not sufficient to show that the shares of stock in controversy were purchased with the separate means of Mrs. Keller.    If

·they were not, they are subject to sale for the payment of her husband's debts, notwithstanding the will.

The judgment will be reversed and the cause remanded that the case may be more fully developed and the rights of the parties more definitely shown than are they by the record before us. It is so ordered.

*Reversed and remanded.*