**AVIS et al. v. FIRST NAT. BANK OF WICHITA FALLS.**

No. 14385.

Court of Civil Appeals of Texas.
Fort Worth.

May 22, 1942.

Rehearing Denied June 19, 1942.

Weeks, Hankerson & Potter, of Tyler, for appellants.

Kilgore & Rogers, of Wichita Falls, for appellee.

McDONALD, Chief Justice.

The First National Bank of Wichita Falls, Texas, named as trustee in the will of J. D. Avis, deceased, brought this suit to obtain a construction of the will. The specific question presented is whether the trustee has authority under the will to execute oil and gas leases. The trustee contends that it has such authority, and the trial court so held. Some of the children of the deceased oppose this theory, asserting that the will does not give the trustee either express or implied authority to execute oil and gas leases, and that, in any event, the trustee has no such authority after the debts of the estate have been paid. It is agreed that all debts of the estate have been paid. The widow of the testator is still alive, and has not remarried.

The will, omitting formal parts, and also omitting a codicil which is not material to the controversy, reads as follows:

"State of Texas

"County of Wichita

"Know all men by these presents:

"That I, J. D. Avis, residing in Wichita Falls, in Wichita County, Texas, being of lawful age and of sound and disposing mind and memory, having in mind the uncertainties of life and desiring to make disposition of my property rights as I would wish them handled after my death, do hereby make, publish and declare this to me by Last Will and Testament, hereby expressly revoking all wills heretofore made by me.

"1. It is my desire that all of my debts, including funeral expenses, shall be paid so soon after my death as convenient.

"2. I hereby make, constitute and appoint the First National Bank of Wichita Falls, Texas, a National Banking cor-poration, as my independent executor and trustee, under this my Last Will and Testament, and as such executor, I give to said First National Bank of Wichita Falls, Texas, the full and ample powers conferred upon it as Trustee, and I direct that no bond shall be required of it, or other security, in its capacity as either executor or trustee, and that no other action shall be hand in the probate court in which this will shall be filed, regarding my estate, other than to prove and record same, and to file an inventory and appraisement of my estate, and a list of all claims. In the event of the failure or refusal of the First National Bank of Wichita Falls to accept the position of executor and trustee, or in case of its resignation or removal as such, then I direct and authorize any District court of Wichita County, Texas, to appoint a successor as such trustee, in which event the substituted trustee shall give an adequate bond to be fixed by the court, and said substituted trustee shall thereupon succeed to all of the rights, powers, and duties of the original trustee.

"3. I hereby give, devise and bequeath all of my property, real personal and mixed of every kind and character, of which I may die seized and possessed, after the payment of my just and lawful debts, unto said First National Bank of Wichita Falls, Texas, as trustee, and unto its successor in this trust, for the uses, purposes and trusts hereinafter specified; and I hereby direct that all of said property together with any changes or accretions thereto, shall be held, used, managed, disposed of, sold, disburses by said trustee, according to the further terms of this Will; and I do hereby grant to said trustee full, ample, complete and absolute power to manage control sell, and dispose of said trust property, rent, make leases thereon, and in every way handle same, subject only to the express limitations hereinafter contained.

"4. I hereby declare that all of the property that I now own or possess is the community property of myself and my wife, Minnie Ola Avis, with the exception of the following, viz: seventy shares of stock in the First National Bank of Wichita Falls, Wichita County, Texas; and twenty five shares of stock in the First National Company of Wichita Falls, Texas, is separate property, having been purchased with money received directly

from my mother's estate; the property situated at the corner of ninth and Burnett in the City of Wichita Falls, being 150 feet by 200 is also separate property, I having received it directly from my mother's estate.

"5. I hereby direct that immediately upon my death, that my trustee herein appointed, shall take full and complete charge of my estate, attend to the probating of this will, and pay my debts and funeral expenses. After that is done I direct that my Trustee shall keep the corpus of my estate intact, if possible, and so far as practical, until the death of my wife subject to the provision hereinafter contained with reference to her remarriage; and shall pay over to said Minnie Ola Avis, the entire net income from my estate during her life time, and as often and at such times as the receipt of income from said estate will justify and shall be deemed expedient by my trustee, but preferably monthly, or quarterly, it being my desire that my said wife shall have ample funds at all times.

"6. In the event that my wife should remarry, after my decease, then I direct that my said trustee shall make an immedate settlement of my entire estate, by setting over or paying to my wife, one-fourth of same, the other three fourth— to be immediately distributed equally between our seven children, F. P. Avis, J. D. (Dave) Avis, Jr., A. W. (Jake) Avis, Mrs. W. F. Weeks, Mrs. H. S. Baum, Mrs. W. U. McCutchen and Mrs. Ralph Dunkelberg, the said trustee being fully empowered to make such disposition of my estate as will enable it to make a fair division, giving one-fourth to my wife, and the other three-fourths equally to the children.

"7. But if my wife shall survive me, and shall not remarry, then at her death, I direct that said estate shall be immediately divided by said trustee, among my children, above named, in equal proportions.

"And in connection with any division of my estate, among my children, I direct that if any of my children above named shall at that time have died, then said trustee shall pay over to that child's natural heirs, that child's portion of my estate; and if that child having died, left no natural heirs, then said portion to be divided equally among the living children, or their natural heirs.

"8. At this time I have made certain advances to my three sons, F. P. Avis, J. D. Avis, and A. W. Avis, all of which is shown on my ledger kept by me, and among my papers; I deem it fiar and equitable to all of my children that these advances should be taken into consideration by my said trustee, in making any division of my estate; and in this connection I direct that my trustee shall require repayment to it by each of said children, so owing me, of the amount so owed at my death, or that it shall be deducted from that child's part of my estate, or if that child be dead, from the part that would go to its natural heirs.

"9. I direct that said trustee shall pay to itself, as compensation for handling this trust, the sum of two per cent on all receipts and two per cent on all disbursements made by it, as I consider this a fair compensation for the labor and responsibility involved. It shall, of course pay out of said estate funds, all other reasonably necessary costs incurred in the management and final disposition of this trust.

"10. There shall be no liability on said trustee for loss resulting from the administration of this trust, except such as occurs through wilful neglect of said trustee, but I admonish such trustee to handle said property as discreetly as it has heretofore managed its own business for many years past.

"11. I do hereby expressly declare that any beneficiary under this trust, who shall attempt to change or contest the provisions hereof, is hereby expressly barred from participating in any manner under this will and trust."

The beneficiaries opposing the execution of oil and gas leases by the trustee have appealed, and will be referred to as appellants.

In reaching a decision, we are required to consider all parts of the will, and to harmonize all provisions of the will and give effect to all of them, if possible. The purposes and objects of the will must be sought. The intention of the testator is to be found in the words used in the will, but in determining the meaning of the words used we may take into account the situation in which the testator was placed, the state of his family, his property, and other circumstances relating to himself individually and to his affairs. It is our duty to discover the intention of the tes-

tator, if possible, and to give such construction to the will as will carry out his intention unless some rule of law or public policy forbids. In 44 Tex.Jur. pp. 680-695, will be found a lengthy discussion, and numerous citations of authorities, relating to the rules applicable to the construction of wills. Among the leading cases are Hunt v. White, 24 Tex. 643; Peet v. Commerce & E. Street Ry. Co., 70 Tex. 522, 8 S.W. 203; Cleveland v. Cleveland, 89 Tex. 445, 35 S.W. 145; Jackson v. Templin, Tex.Com.App., 66 S.W.2d 666, 92 A.L.R. 873; Hunting v. Jones, Tex.Com. App., 215 S.W. 959; Wallace v. First Nat. Bank, 120 Tex. 92, 35 S.W.2d 1036; Federal Land Bank v. Little, 130 Tex. 173, 107 S.W.2d 374; Hassell v. Frey, 131 Tex. 578, 117 S.W.2d 413. See also Simmons v. O'Connor, Tex.Civ.App., 149 S.W.2d 1107, writ dismissed.

We have been unable to find any decision, either from Texas or from any other American jurisdiction, passing upon the precise question presented here, that is to say, whether a trustee is authorized to execute oil and gas leases under a will which contains a power of sale, but does not specifically refer to oil and gas leases.

Both parties to the appeal submit to us, as analogous, decisions of our Texas courts which have considered whether the wills before them conferred upon the trustee an implied power to mortgage property of the estate, among them being Jackson v. Templin, Tex.Com.App., 66 S.W.2d 666, 92 A.L.R. 873; Neilson v. Schoellkopf, Tex.Civ.App., 122 S.W.2d 281, writ refused; Faulk v. Dashiell, 62 Tex. 642, 50 Am.Rep. 542; Laborde v. First State Bank, Tex.Civ.App., 101 S.W.2d 389, writ refused. While the reasoning in the opinions in these cases is helpful, the cases are not, in our judgment, controlling upon the question before us.

The trustee cites Whaley v. Quillin, Tex. Civ.App., 153 S.W.2d 969, writ refused by this court. There the trial court upheld the authority of the trustee to execute oil and gas leases, but none of the parties to the appeal attack that portion of the judgment.

Appellants cite Ohio Oil Co. v. Daughetee, 240 Ill. 361, 88 N.E. 818, 36 L.R.A., N.S., 1108. The will in that case did not contain a power of sale. It authorized the trustee to lease property, and the question was whether the power to lease authorized an oil and gas lease. The court held that it did not, on the ground that an oil and gas lease constituted a sale of an interest in the property.

Appellants also cite Bean v. Bean, Tex. Civ.App., 79 S.W.2d 652, writ refused, in which it was held that the power of attorney there given, authorizing the sale of an undivided interest in a tract of land, was insufficient to support an oil and gas lease executed by the attorney in fact. We have carefully considered that holding, but are unable to accept it as conclusive upon the question before us.

Perry, in Vol. 11 of his work on Trusts and Trustees, 7th Edition, § 774, page 1326, appears to assert that trustees cannot sell the minerals separate from the land, citing as authority two English cases which are not available to us, and the early Pennsylvania case of Cadwalader's Appeal, 64 Pa. 293. We have examined the last mentioned case, and do not consider that it supports the text. The opinion does not reflect the nature of the appointment of the trustees, whether under a will or otherwise, but actually the court upheld a sale of the land separate from the minerals.

In Bogert on Trusts, Vol. 4, § 798, page 2310, it is said: "Should mines and oil be discovered after the creation of the trust, it appears to be the rule in the United States that the trustee may not lease the property for mining purposes without the consent of the remaindermen."

The author cites as his authority Ohio Oil Co. v. Daughetee, supra, and Priddy v. Griffith, 150 Ill. 560, 37 N.E. 999, 41 Am. St.Rep. 397. The Daughetee case, which we have already mentioned, construes a power to lease, not a power to sell. The Priddy case involves the dower rights of the wife, and is simply not in point.

But it is to be noted that the same author, in Vol. 3, § 741, page 2182, has this to say:

"While the older and more conservative attitude of the courts was that of hostility to powers of sale, especially with relation to realty, and the older decisions declare that a presumption exists against the existence of a power of sale, it is believed that recently the courts have been much less reluctant to find an implied power of sale in a trust instrument. The medieval worship of real property has waned. Land has become very much an article of com-

merce. The modern trust demands frequent shifts in its holdings.

"While in some instances the courts decline to decree that an implied power to sell is present, the greater number of the adjudications are on the side of the trustee seeking a holding that he has authority to sell."

In Scott on Trusts, Vol. 2, § 189.7, page 1201, the author suggests that the trustee ought to have power to make mineral leases if such is a prudent method of making the property productive, and that the trustee ought in turn to make proper allocation of the proceeds to principal and to income.

In the English work of Lewin on Trusts, 13th Ed., page 1064, it is said: "A trust or power to sell or dispose of land includes a trust or power to sell or dispose of part thereof, whether the division is horizontal, vertical, or made in any other way. 'Land' includes mines and minerals, whether or not severed from the surface, and any strata or seam of minerals or substances in or under any land, and powers of working and getting the same, so that no leave to sell surface and minerals apart is now required and trustees for sale are in the same position as a tenant for life under a settlement of settled land."

While the author's opinion, just cited, may be in part based upon English statutes, we quote it as an indication of the trend of thought on the question.

Although both parties to the appeal seem to treat the power to execute oil and gas leases, if it exists at all, as an implied power, we are not so certain that the question is not one of express power to sell. The power to sell is general. But for some rule of law, the sale of any interest in the land would be authorized expressly. While we think that it may be admitted that the trustee could not, under a general power of sale, sell only an undivided interest in the land, we do not consider that it follows as a matter of course that he could not sell the minerals apart from the surface. If we correctly interpret the decisions which we shall cite, the sale of minerals apart from the surface does not fall in the same category as a sale of an undivided interest in land.

The Texas case which seems most in point to us is Theisen v. Robison, 117 Tex. 489, 8 S.W.2d 646, 649. The question at issue was whether certain acts of the legislature, authorizing the issuance by the land commissioner of oil and gas permits on Texas University and other public lands, were unconstitutional. Sections 12 and 15 of Article 7 of the Texas Constitution, Vernon's Ann.St., provided that lands set apart for the University might be sold. The precise question to be decided, therefore, was whether the constitutional authority to "sell" the University lands was sufficient to support legislation providing for the issuance of oil and gas permits on the lands. The Supreme Court held the oil and gas permits provided for in the statutes to be similar in effect to oil and gas leases. The court in part said: "We find no language in section 12 to forbid the Legislature to separately sell the mineral from the state's remaining estate in University lands."

The court further said: "We would look to the common law to arrive at the meaning of the constitutional command that the land be 'sold'; for, as has so frequently been pointed out, a Constitution written and adopted by men who were most familiar with common-law customs and principles should be interpreted by giving the words of the Constitution the meaning they had under the common law."

The court then discussed at length the long established custom, prevailing since the times when the oldest mines in England were worked by the Romans, to realize on minerals by means of separate sales thereof for royalty.

We quote further from the opinion: "Nothing is plainer to us than that, the Constitution having imposed the duty on the Legislature to sell University lands to the best advantage of the University's permanent fund, there was no lack of legislative power to sell the lands containing minerals in the way customarily used to avoid sacrifice of the value of the minerals. Since at the date of the adoption of the Constitution and for prior centuries minerals were usually converted into money by sales working a severance of the mineral estate, consummated by means of writings commonly called leases, for stipulated royalties, the Legislature was plainly empowered to consummate in that manner separate sales of the minerals in the University lands. Any other view would defeat the cardinal purpose of the framers of the Constitution to realize as great a fund as possible from these lands—including their minerals—for the University."

The court then discussed the prior cases holding that the sale of oil and gas leases constituted a sale of a portion of the land.

Denying that an unconstitutional diversion of the University's permanent fund was accomplished by the issuance of the oil and gas permits, the court said:

"As a result of the sale, the purchaser owns the oil and gas, and the University permanent fund owns the entire proceeds of their sale.

"As a matter of course, the state can sell no part or portion of its lands without diminishing the value of what remains. Should the state sell 80 acres out of an 160 acres of uniform value, that which remains would be worth only half the value of the entire tract; but the state is none the poorer in retaining 80 acres and the proceeds of 80 acres. Exactly the same thing is true when the mineral estate in land is sold separately from the remaining estates, and it belies the experience of mankind throughout the ages to assume that there is any more profitable mode of sale for the realization of the full value of mineral bearing land."

The holding of the Supreme Court in Ehlinger v. Clark, 117 Tex. 547, 8 S.W.2d 666, 671, was to the same effect with respect to the right of a county to lease its school lands for oil development. The court said: "There is nothing in the constitutional provision here involved which in the remotest degree limits the right of the commissioners' court to make a sale of its mineral estate upon terms similar to those made by citizens generally."

The language of the Theisen case may be paraphrased so that it fits the case on appeal almost exactly, if the word "will" be substituted for the word "Constitution", and if the word "trustee" be substituted for the word "Legislature".

Other courts have reached the same conclusion as have the Texas courts in holding that an oil and gas lease on public lands is authorized by constitutional provisions allowing the sale of such lands. See the lengthy opinion of the Supreme Court of New Mexico in State v. Field, 31 N.M. 120, 241 P. 1027, 1036, and the many decisions therein cited. The court said, in part: "Appellee also contends that, where the Constitution and statute conveying powers on the commissioner fail to specifically authorize him to reserve the minerals, he has no such power. We do not agree to that narrow construction of the powers of the commissioner."

In Terry v. Midwest Refining Co., 64 F.2d 428, 434, before the Tenth Circuit Court of Appeals, it was contended that the State of New Mexico had no lawful authority for selling the surface apart from the minerals. In referring to the Congressional authority upon which the sale of the land was based, the court said: "The manifest and predominating purpose of Congress was that the lands were to be disposed of in a manner that would bring the greatest returns to the beneficiary of the grant. That, of course, is always the duty of a trustee. The state took the lands in trust to that end. * * * The reservation of the mineral was not prohibited by the Enabling Act, it was a wise, just and lawful act on the part of the trustee's agent administering the trust, and neither void nor voidable as being in contravention of the terms or purposes of that act."

In Martin v. Dial, Tex.Com.App., 57 S.W.2d 75, 81, 89 A.L.R. 571, it was held that the power of a surviving partner to sell partnership property for the purpose of winding up the partnership included the power to execute oil and gas leases on the partnership lands. We quote from the opinion: "But it is argued that the surviving partner could sell the minerals in the land only for cash. We are unwilling to assent to a proposition which would so restrict the power of a surviving partner in the liquidation of firm assets. The power of such partner to sell minerals in lands necessarily implies an authority to sell in the usual and customary way in which such minerals are ordinarily disposed of. * * * No sound reason has been advanced why a surviving partner should not be accorded the privilege of selling the minerals in a tract of land owned by the partnership in a way that is generally recognized as being the most advantageous. It is a matter of common knowledge that the average landowner almost universally disposes of the minerals in land situated in nonproductive territory through the execution of mineral leases retaining a specified royalty."

The Commission of Appeals, in Little v. Childress, 17 S.W.2d 786, held: "The Statute of Frauds (article 3995, Rev.St.

1925) forbids any action to be brought in any court 'upon any contract for the sale of real estate or the lease thereof for a longer term than one year.' That the permit authorized by law to be issued for the exploration and production of oil and gas upon the public lands in this state is a sale of lands is thoroughly settled in Theisen v. Robison [117 Tex. 489], 8 S. W.2d 646."

In Ferguson v. Commissioner of Internal Revenue, 45 F.2d 573, the Fifth Circuit Court of Appeals held that the making of oil and gas leases on Texas lands constituted "sales", within the meaning of certain provisions of the federal income tax laws.

In Smith v. Womack, Tex.Civ.App., 231 S.W. 840, writ dismissed, it was held that the will did not authorize the executors to execute oil and gas leases. The opinion appears to indicate that the court was of opinion that the question of whether the executors had power to execute oil and gas leases depended upon whether the will conferred the power to sell.

■ Our conclusion, reached after considering the above authorities, is this: The power to sell, contained in a will, indicates an intention on the part of the testator to confer the power to execute oil and gas leases.

It now becomes necessary to determine whether the provisions of the will before us, considered in the light of whatever surrounding circumstances may be shown in the record, including the fact that all debts of the estate have been paid, authorize the trustee to make oil and gas leases.

■ In the second paragraph the testator recognizes the fact that the Bank is to act in two capacities, that of executor, and that of trustee. He recites that he confers upon the Bank, as executor, the "full and ample powers" conferred upon it as trustee. The reasonable interpretation of the language used is that he intended to confer power to sell upon the Bank in both of the two capacities in which it was to act, that of trustee as well as that of executor. To hold otherwise is to render meaningless the provisions conferring upon the trustee the power to sell.

It will be observed that in the third paragraph the testator leaves to the Bank, as trustee, such of his property as remains after payment of his debts, and that such property, meaning of course that which remains after the debts are paid, shall be used, held, managed, disposed of, sold and disbursed by the trustee. If property can be sold only until the debts are paid, this grant of power to the trustee to sell would be without meaning. As is said in the early part of this opinion, it is our duty to give effect to all provisions of the will, if possible. The language of this paragraph is unusually strong: "I do hereby grant to said trustee full, ample, complete and absolute power to manage, control, sell, and dispose of said trust property, rent, make leases thereon, and in every way handle same, subject only to the express limitations hereinafter contained."

Th United States Supreme Court has said that the term "to dispose of" has a broader meaning than the term "to sell". Phelps v. Harris, 101 U.S. 370, 380, 25 L.Ed. 855.

After using the broadest language, the testator concludes with the expression "and in every way to handle same", as if to be certain that he should overlook nothing.

■■ Appellants attach significance to two qualifying phrases found in the third paragraph of the will.

The first is that the property shall be held, used, etc., "according to the further terms of this will". The second is that the trustee is granted power to manage, control, etc., "subject only to the express limitations hereinafter contained".

Appellants appear to consider that the two qualifying phrases mentioned relate especially to the power to sell. We consider that the phrase first quoted relates to the entire handling of the estate and to its final disposition, that is to say, that the income is to be devoted to the support of the widow until her death or remarriage, and that the estate is then to be disposed of as provided, that is to say, by paying it over to the ultimate beneficiaries. The phrase last quoted suggests to our minds a broad rather than a narrow interpretation of the powers granted. The only express limitations thereafter contained in the will are that only the income shall be paid over to the widow, and that upon her death, or remarriage, final disposition is to be made of the estate.

Another phrase found in the third paragraph which is significant to us is that directing that the property, "together with any changes or accretions thereto", shall be held, used, etc. The use of the word "changes" is entirely in harmony with the grant of the power to sell.

Appellants argue that the language of the fifth paragraph indicates a purpose not to sell after the debts are paid. After ordering the payment of debts, the will recites: "After that is done I direct that my Trustee shall keep the corpus of my estate intact, if possible, and so far as practical, until the death of my wife," etc.

The word "corpus" is used throughout the law of trusts to indicate the principal of the estate, as distinguished from the income of the estate. See 20 C.J.S., Corpus, p. 235, and decisions there cited. Considered in the light of all the provisions of the will, it seems to us that the testator, by the use of the word, was referring to the principal or capital of the estate, as distinguished from the income, rather than to the particular property which might be on hand when the trustee should take possession. The provision, with the qualifying phrases found in it, is directory rather than mandatory in tone. The construction which appears reasonable to us is that the testator intended that the principal or capital of the estate should be kept intact, if possible and so far as practical, and that, if capital assets of the estate were sold, the proceeds should be allocated to principal and should not be treated as income to be paid over to the wife.

It is to be observed, both from the provisions of the will, and from the evidence relating to the testator's connections and associations with the Bank which he appointed as trustee, that he had the greatest confidence in the integrity and business ability and judgment of his trustee. Taking into account both community and separate property of the testator, he owned four hundred shares of the capital stock of this Bank. He was described as a customer and friend of the Bank. He granted his trustee broad powers. He provided that the trustee should act independently of the orders of the probate court, and that the trustee should not be liable for losses except in the case of wilful neglect. He admonished the trustee to handle his property as discreetly as it had handled its own business for many years past.

It is a matter of common knowledge that owners of land in Texas in non-productive areas have realized enormous sums of money in the form of bonuses received from the sale of oil and gas leases. It is commonly known that the land owner of small or modest means is not so situated that he can, with reasonable prudence, develop his own land for oil and gas purposes. The inventory and appraisement of this estate plainly indicates that the trustee could not with the prudence and conservative practices required of trustees have drilled for oil and gas on the lands belonging to the estate. It is our considered opinion that no court would be justified in declaring that the trustee of this estate, acting under the will before us, should be denied the opportunity of adding to the funds of the estate by selling oil and gas leases if the area is yet undeveloped, and if the area is being developed, then all the more reason exists for not denying to this trustee the right to follow the practice which has been declared by our own Supreme Court to be the wisest method for a land owner to follow, that is, to lease the land to oil operators who are able to explore and develop the properties if conditions so warrant. And it is elemental that under a will like the one before us the question of whether to lease, and for what price, is one addressed to the discretion and business judgment of this trustee in whom the testator had such great confidence.

The testator in his will expresses the desire, in the fifth paragraph, that his wife shall have ample funds at all times. If the trustee can add to the corpus of the estate by selling oil and gas leases, and thus increase the income to be paid to the widow, and if in its judgment such ought to be done, it should not be denied the right to do so under the terms of this will.

We have no reason to presume that the trustee will fail to make the proper allocation of any bonuses, rentals and royalties so received.

The judgment of the trial court is affirmed.