SECURITIES INVESTMENT COMPANY OF ST. LOUIS, Appellant,

v.

FINANCE ACCEPTANCE CORPORATION, Appellee.

No. 15801.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Oct. 28, 1971.

Rehearing Denied Dec. 9, 1971.

Irion, Cain, Magee & Davis, Don W. Davis, Dallas, John Culpepper, Jr., College Station, for appellant.

Ross, Griggs & Harrison, James E. Ross, Houston, for appellee.

COLEMAN, Justice.

This suit was filed by appellee, a licensee under the Texas Consumer Credit Code, against appellant, a company engaged in the business of loaning money to such consumer finance companies, to recover double the amount of alleged usurious interest paid by appellee to appellant. Appellant answered and filed a cross-action for the debt due to it by appellee and for foreclosure of its lien against appellee's notes receivable. Appellee then amended its petition and, in addition to the cause of action based on usury, sought actual and exemplary damages by reason of the action of appellant in taking possession of certain business records of appellee and in attempting to collect from the makers notes

representing loans made by appellee and assigned to appellant as security.

The trial court entered a judgment for appellee, based on a jury verdict, awarding both actual and exemplary damages, as well as recovery for usurious interest paid. After allowing an offset in the amount of the debt due to appellant from appellee, the court awarded appellee a judgment in the sum of $72,104.23.

The questions presented require a construction of the contract forming the basis of the transactions between the parties. The first contract was executed in December, 1965. In May, 1966, a new contract was signed, the terms of which were the same as the original contract with the exception of the provisions concerning the interest to be paid by appellee.

The contracts defined Receivables as meaning promissory notes, conditional sales contracts, lease agreements, chattel mortgages, contracts, acceptances, accounts receivable, choses in action and other forms of obligations. It then provides:

"1. The Lender will from time to time, at its discretion, lend to the Borrower a sum not in excess of Seventy-five      per cent (75%) of the unmatured and unpaid balance of each Receivable acceptable to the Lender, which is assigned, transferred and delivered to the Lender as hereinafter provided. The Lender will, from time to time at its discretion advance to the Borrower such additional sum as will increase its total loans to the Borrower then outstanding to an amount not in excess of Seventy-five      per cent (75%) of the total unmatured and unpaid balances of the Receivables currently assigned and currently acceptable to the Lender, provided, however, that (i) Borrower shall have promptly and fully discharged its obligation to the Lender as hereinafter set forth, and (ii) Borrower shall not be in default in any of its other undertakings or obligations to the Lender, including but not limited to the payment of in-terest as set forth in paragraph 2 below, and (iii) the Lender shall be satisfied that there has been no adverse change in the financial condition of the Borrower. It is understood proceeds of any loan made hereunder shall be for the conduct and operation of the undersigned's loan and finance business and for no other purpose.

"      .    .    .    .

"3.      .    .    .    .      Receivables shall be assigned and delivered to the Lender at its office in St. Louis, Missouri, by means of instruments called 'Schedules' in form and manner satisfactory to Lender, executed by the Borrower and containing certain covenants, warranties, representations and undertakings by the Borrower relative to each such Receivable.    .    .    .    .

"4.    The Lender shall have the right at all times to collect any and all sums due under said Receivables by having such sums paid directly to the Lender or the Lender's nominee, such collection to be made either in the Lender's name or in the name of the Borrower, and in this connection, the Lender may give such notice and take such action, legal or otherwise as may be necessary to effectively exercise this right.    .    .    .    .      However, until the Lender shall have exercised the right of directly collecting such Receivables or of having payments on such Receivables sent directly to Lender, as above provided, the Borrower will, at its own expense, promptly collect each installment of each of said Receivables when and as each respectively matures and use the proceeds of such collections in the conduct of its loan and finance business and for no other purpose.

"      .    .    .    .

"7.    In case any Receivable which has been assigned to the Lender and treated as acceptable collateral by it should at any time, and for any reason become or

be deemed unacceptable to the Lender as collateral security, then the Borrower will, within five (5) days after written notice thereof pay to the Lender a sum equal to the unpaid (whether or not matured) amount of such unacceptable Receivable, or the Lender at its sole option may accept in lieu of such payment the assignment of other Receivables in equal amounts acceptable to it.

"8. In the event that the aggregate amount of Borrower's indebtedness to the Lender exceeds Seventy-five per cent (75%) of the total unpaid and unmatured balances of the Receivables currently assigned and currently acceptable to the Lender, the Borrower shall forthwith, whether or not any notice or demand is made by the Lender therefor pay to the Lender a sum which will so reduce the aggregate indebtedness of the Borrower as to bring the percentage of Receivables within the amount specified above herein, or the Lender at its sole option may accept in lieu of such payment the assignment of other acceptable Receivables in an amount sufficient so that aggregate indebtedness will not exceed Seventy-five per cent (75%) of the unpaid and unmatured balances of acceptable collateral assigned to Lender.

"9. In making loans to the Borrower, from time to time, it is expressly understood that the Lender is relying upon written representations of the Borrower as to the Borrower's financial responsibility. The Borrower will furnish to the Lender monthly and yearly financial statements and such other reports and data so as to reflect the current status of the Borrower's business as well as the Receivables assigned to the Lender. The Borrower hereby authorizes the Lender or its agent, at all reasonable times to have access to the books, accounts, records, memoranda, correspondence and documentary evidence of the Borrower in any way relating to the Receivables assigned to the Lender so the Lender may inspect, examine, audit and verify the same and make any extracts therefrom.

"10. It is understood that if this proposal by the Borrower is accepted by the Lender, the collateral loan agreement resulting therefrom shall continue in effect from the date of such acceptance by the Lender until terminated by either the Borrower or the Lender giving to the other sixty (60) days written notice of such termination. Such termination shall not, however, modify or change any of the Borrower's obligations or undertakings as to loans already made to the Borrower and as to any Receivables already assigned to the Lender. In the event of such termination the Borrower shall pay all indebtedness due to Lender by Borrower on the date such termination is effective, including interest to the date of payment. Until this agreement is terminated, the Borrower agrees, that without the Lender's written consent, no Receivables shall be sold or hypothecated as collateral security except to the Lender. Further, until this Agreement is terminated, Borrower agrees it will not, without the prior written consent of Lender, incur any indebtedness for money borrowed unless such indebtedness is specifically junior and subordinate in right of payment and in all other respect to the indebtedness due from Borrower to Lender. Borrower further agrees so long as any indebtedness is due Lender hereunder, it will not, without the prior written consent of Lender sell, transfer, convey, pledge, or otherwise encumber the capital stock of any of its subsidiary companies. After the collateral loan Agreement has been terminated and after all of the Borrower's indebtedness to the Lender of whatsoever kind and nature has been fully paid and discharged, then any Receivables remaining in the hands of the Lender shall be reassigned and delivered to the Borrower.

"11. It is intended the Lender shall receive the re-payment of all principal sums loaned with interest thereon as pro-

vided herein free from any expense, except normal operating expense, . . .

"12. In the event (i) any amount due to be paid to the Lender hereunder shall not be paid as and when due, or (ii) should the Borrower fail to assign additional security as herein required or . . . (vii) the Borrower shall breach any provision contained herein (or in any Schedule covering any Receivable assigned to the Lender), then upon the happening of any one or more of such events all indebtedness of the Borrower to the Lender as herein provided shall immediately become due and payable and shall be forthwith paid and discharged by Borrower, anything to the contrary herein notwithstanding. In the event the Borrower thereupon fails to promptly pay in full the aggregate of all such sums the Lender may proceed to protect and enforce the Lender's rights . . ., the Lender shall have (a) the right (which Lender has at all times whether or not a default shall have occurred under this paragraph 12) to collect all or any part of the sums due under the Receivables assigned hereunder and pursue all rights and remedies of the Borrower against any of the persons obligated thereon either in the name of the Borrower or of the Lender, . . . ."

In the original contract the Borrower agreed to pay to the Lender monthly on the 10th day of the month interest on the average daily balance of all indebtedness during the preceding calendar month at an annual rate equivalent to $5\frac{1}{2}$ per cent over the highest prime rate of New York banks for commercial loans during said month.

The subsequent contract provided for monthly payments of interest at an annual rate equivalent to 10 per cent on the average daily balance of all indebtedness, and for the payment monthly of a service charge of $\frac{1}{12}$ of 1 per cent of such balance.

The parties operated under the loan agreement until February 6, 1967, when appellant terminated the contract and demanded that appellee pay its entire indebtedness to appellant within sixty days. Appellee contended that the contract only required the payment monthly of 75 per cent of the amounts collected from its customers until the indebtedness was liquidated. Thereafter appellant seized and removed appellee's customer credit cards without securing appellee's permission. Appellant then notified appellee's customers to make all payments on their accounts with appellee to appellant. Some payments were made to appellant before these records were returned in compliance with a court order. There is testimony that appellee's ability to collect its accounts was impaired by this action. Some ninety accounts were determined to be uncollectable after May, 1968, although there were collection problems on these accounts prior to the time the cards were taken.

Prior to the termination of the contract appellant had loaned to appellee the aggregate sum of $265,000.00. At the time of trial the sum of $226,402.59 plus 10 per cent per annum interest from February 1, 1968, was unpaid.

In answer to the issues submitted, the jury found (1) that before the execution of the contract appellant represented to appellee that under the terms of said contract appellant could not require repayment of the principal in excess of 75 per cent of the total number of monthly installments due appellee from its customers; (2) that appellee relied upon the representations; (3) that such reliance was reasonable; (4) that at the time the representation was made appellant intended to comply with the representation; (4) that at the time of the execution of the contract of October, 1965, appellee "intended that the contract not require the repayment of principal in excess of 75 per cent of the total number of monthly installments due Finance Acceptance Corporation from its customers;" (5) that in the removal of the ledger cards from appellee's office, appellant was not acting in the good faith belief that it had the right to take such action; (6) that ap-

pellant knew or should have known that the removal of the ledger cards would cause damage to appellee; (7) that $10,000.00 damage to appellee "resulted" from appellant's removal of the records; (8) that appellant "failed to perform its 'loan agreement' in the manner in which it had represented it would perform;" (8) that $100,000.00 would reasonably compensate appellee for the damages resulting from such failure; (9) that $100,000.00 should be awarded to appellee as exemplary or punitive damages "for the acts of Securities Investment Company;" (10) that appellee used reasonable diligence in seeking new sources of financing after the termination of the loan agreement; (11) that under the loan agreement appellant was not entitled to collect all accounts assigned to it by appellee by having such accounts paid directly to appellant; [(12), (13), and (14) were predicated in such a manner as not to require an answer.] (15) that $15,000.00 was the reasonable value of the services rendered to appellant by its attorneys in this case.

The contract clearly provides that it may be terminated by either party on sixty days' written notice. Appellant exercised this option by letter dated February 6, 1967, in which demand was made for repayment of all of the money loaned to appellee, with interest within sixty days. Appellant contends that this action was authorized by the following language of the contract: " . . . Such termination shall not, however, *modify* or *change* any of the Borrower's obligations or undertakings as to loans *already made* to the Borrower and as to any receivables already assigned to the Lender. In the event of such termination the Borrower shall pay all indebtedness *due* to Lender by Borrower on the date such termination is effective, including interest to the date of payment." (emphasis added.)

The obligation of the borrower to make payments on the principal of the indebtedness is spelled out in the agreement. If a receivable assigned to the lender should become or be deemed unacceptable to the lender as collateral security, the borrower was obligated, after written notice, to pay to lender a sum equal to the unpaid amount of such receivable. In the event the aggregate amount of borrower's indebtedness to the lender exceeded 75 per cent of the total unpaid and unmatured balances of the receivables currently assigned and currently acceptable to the lender, whether or not notice or demand is made by lender therefor, borrower is obligated to pay to lender the amount of money necessary to reduce the aggregate indebtedness to an amount within the 75 per cent limit.

By paragraph 4 the lender is given the right to require that all installments due under the receivables assigned to it be paid directly to it, and to require that all payments made to borrower on receivables previously assigned to lender be forwarded to lender on a daily basis. However, until lender exercised these rights borrower was authorized by the contract to use the proceeds of such collections in the conduct of its business.

Paragraph 12 provides seven additional contingencies upon the happening of which "all indebtedness of the Borrower to the Lender as herein provided shall immediately become due and payable and shall be forthwith paid and discharged by Borrower, . . ." Among the listed contingencies are the failure of borrower to pay sums due under the contract, and the breach of any provision of the contract by borrower.

The Borrower's *"obligations* or *undertakings"* on existing loans would be changed and modified materially if the termination of the contract had the effect of making such loans payable in full on the date of termination. Disregarding paragraph 10 of the contract there is no provision setting a date on which these loans are to be paid in full. Under certain conditions set out in paragraph 12 "all indebtedness of the Borrower to the Lender . . . shall immediately become due and payable and shall be forthwith paid

and discharged by Borrower, anything to the contrary herein notwithstanding." This language contrasts sharply with that of paragraph 10 providing for the payment of "all indebtedness due to Lender" on the effective date of termination of the contract. Other provisions of the contract call for partial payments to maintain the proper ratio of security to debt, or for payments from the collection of assigned receivables.

Paragraph 10 must be construed considering the contract in its entirety in light of the circumstances existing at the time of the execution of the contract. The search is for the intention of the parties as expressed in the language used. 17 Am.Jur. 2d, Contracts, §§ 244, 245.

"The word 'due' has a double meaning: (1) That the debt or obligation to which it applies has by contract or operation of law become immediately payable; (2) an existing indebtedness without reference to the time of payment, in which it is synonymous with 'owing', and includes all debts, whether payable in praesenti or in futuro . . ." Oden v. Gates, 119 Tex. 76, 24 S.W.2d 381 (1930).

■ The trial court permitted testimony that the directors of appellee corporation, at the time they were considering authorizing the execution of the contract, were concerned with the language of the contract under consideration and asked appellant's representative whether the language gave appellant the right to demand payment of the entire debt on termination of the contract. There was testimony that this representative called their attention to the word "due" and stated that under the agreement no payment of the principal in excess of 75 per cent of the collections from the receivables could be required.

"Where words used in a contract are susceptible of more than one meaning, the courts will, if possible, ascertain from all the provisions of the contract the sense in which such words were used by the parties . . ." ibid, § 250. Nowhere in the contract is there a provision which can be construed as meaning that under some conditions repayment could be made out of 75 per cent of the collections from the receivables. This evidence had the effect of adding to the written contract a provision not found therein, and was inadmissible by reason of the Parol Evidence Rule. Hunt v. White, 24 Tex. 643 (1860).

"The Parol Evidence Rule makes the written instrument the sole repository of the legal transaction, in the sense that the transaction . . . must be derived from the written terms alone. . . . Written words can be translated into appropriate action by the court only through the process of ascertaining what the words stand for in the way of particular conduct or particular tangible objects. This process of interpretation is one which every human expression is subjected to wherever it is sought later to be used by human beings as a measure of conduct. . . . This process is often unnoticed and frequently simple, but often again the meaning of the writing is a contested question between the parties, and evidence is adduced to solve the issue. The distinction between such interpretative evidence even where it consists of expressions of the parties to the instrument, and evidence of such expressions when offered to be used as a part of the contract, deed or other transaction, and hence prohibited by the Parol Evidence Rule, is clear. The one type of evidence concedes the supremacy of the writing and merely seeks to illuminate its meaning. The other seeks to displace, or annex itself to, the writing. Evidence offered strictly for the purpose of aiding in the construction of a written instrument is not within the prohibition of the Parol Evidence Rule." McCormick and Ray, Texas Law of Evidence (2nd Ed.), § 1681, p. 516.

See, also: James Stewart & Co., Inc. v. Law, 149 Tex. 392, 233 S.W.2d 558 (1950); Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579 (1938); Beall

v. Hardwicke-Etter Co., 460 S.W.2d 516 (Tex.Civ.App.—Waco 1970, writ dism'd).

The meaning of the provision of the contract authorizing termination of the contract without cause is not clear. If the word "due" was used in the sense of "owing", the previous provision that the termination shall not modify or change appellee's obligations under loans already made would have little meaning. On the other hand giving the word "due" the meaning "immediately payable", the provision would be of considerable importance since the "loans already made" probably would continue outstanding for a period of years. While the contract does not provide for periodic repayment of principal, it has been demonstrated that principal payments may become payable under certain conditions without termination of the contract.

It was contemplated by the parties that the money received by appellee under the contract would be used in appellee's business of loaning money payable in installments over extended periods of time. It would be contemplated by the parties that the necessity of repaying the principal of large loans on sixty days' notice would present considerable difficulty. The contract contained other provisions to protect the lender in the event the borrower was not properly operating the business, or failed to furnish adequate security for the loans. The language of paragraph 12, providing for repayment, is clear and contrasts sharply with that used in the paragraph under examination. A consideration of the entire contract, and the circumstances surrounding its execution, leads to the conclusion that the contract should be construed as requiring repayment of the principal of the loans, after the termination of the contract under the 60 day notice provision, except for amounts immediately payable under other provisions of the contract only from collections on receivables assigned to lender.

The contract was effectively terminated by the notice given appellee by appellant. Borrower's obligations on the loans already made were not modified or changed by this action, including the obligation to collect all receivables assigned to lender, and, on demand, to forward such collections to lender on a daily basis. There was no obligation on lender to make additional loans to the borrower.

There was testimony that appellee failed to maintain sufficient acceptable collateral with appellant as required by the contract. This was a disputed issue of fact, which, if established, would have authorized appellant's demand for repayment of the principal of the loans under paragraph 12 of the contract. No issues on this matter were submitted to the jury. Appellee's pleading stating that appellant "may have been" within its contractual rights in demanding that appellee make payment of principal amounts owed by it to appellant is not a judicial admission that appellant was within its contractual rights in so doing. Appellant failed to establish its right to demand repayment in full of appellee's indebtedness as of the date such payment was required.

By its contract appellant was authorized to inspect and copy appellee's records. Appellee was required to, and did, forward to appellant all notes, chattel mortgages, and other instruments constituting evidence of indebtedness, which they were assigning to appellant as collateral. The contract did not authorize appellant to remove appellee's ledger cards from appellee's office. Appellee was entitled to recover from appellant the damage it sustained as a result of such action.

Special Issue No. 6–a reads: "What amount of damages to Finance Acceptance Corporation, if any do you find from a preponderance of the evidence, in dollars and cents, resulted from Securities Investment Company's removal of the records of Finance Acceptance Corporation?" No instruction on the measure of damages accompanied the issue. Appellant objected to this failure to submit an explanatory in-

struction on the grounds that: (1) the issue was "duplicitous" with the damages inquired about in Special Issue No. 8; (2) as a matter of law no damage could have accrued as a result of the mere removal of the records, the damages, if any, necessarily following from the acts of appellant in the use made of the records; (3) the failure to instruct the jury as to the elements of damage.

The evidence established a conversion of the records, and the jury found that appellant was not acting in the good faith belief that it had a right to take the property. Appellee secured the return of the property through court action. Appellee was entitled to recover the value of the loss of use of the records during the period they were wrongfully detained. Ellis Oil Co. v. Adams, 109 S.W.2d 1026 (Tex.Civ.App.—Beaumont 1937, err. dism'd).

■ There was no evidence on which the jury could base an award for loss of use of the records. If special damages by reason of the conversion are sought, they must be pleaded. 14 Tex.Jur.2d, Conversion, § 68. Appellee plead that they suffered special damage because of their inability to collect their accounts. There is a question as to whether the damage alleged proximately resulted from the wrongful act charged, which was not submitted to the jury by Special Issue No. 6-a. El Paso Development Co. v. Ravel, 339 S.W.2d 360 (Tex.Civ.App.—El Paso 1960, writ ref., n. r. e.).

Where the court's charge authorizes a jury to consider items of damage about which there is no proof, the charge is erroneous and an objection on that ground must be sustained. Hodges v. Plasky, 300 S.W.2d 955 (Tex.Civ.App.—Austin 1957, writ ref., n. r. e.).

■ Special Issue No. 7 asked whether appellant "failed to perform its 'loan agreement'" with appellee "in the manner in which it had represented it would perform." We sustain appellant's point that

this amounts to a global submission, or a general charge, since it did not submit an identifiable act, omission, breach, representation, or failure. Cantrell v. Garrett, 342 S.W.2d 466 (Tex.Civ.App.—Houston [1st Dist.] 1961); American National Insurance Company v. Allen, 370 S.W.2d 140 (rev'd on other grounds 380 S.W.2d 604).

■ We also are in agreement with appellant's contention that there is no legal theory which would allow appellee to recover damages for failure to perform "in the manner it had represented it would perform." Unless the manner of performance is made part of the contract so that the failure constituted a breach of the contract, liability for damages would not arise.

■ Since Special Issue No. 8 was predicated upon Special Issue No. 7, we need not consider in detail the various objections levied against it. No instruction was given with reference to the elements of damage which the jury might consider. In this the trial court erred. 17 Tex.Jur. 2d, Damages, § 285, p. 344.

■ Special Issue No. 9 is concerned with exemplary damages. It was not conditioned on any other finding, and merely asks that the jury find the sum of money which should be awarded to appellee "as exemplary or punitive damages for the acts" of appellant. The jury was instructed that before they could find exemplary damages they must find that the "actions" of appellant were done with reckless disregard of the consequences, or malice or intent to injure appellee. The issue is impermissibly broad in failing properly to limit the "acts" for which such damages might be awarded. An objection on this ground was not made in the trial court and the point raising this objection cannot be sustained. However, since the jury verdict finding actual damage cannot be sustained, the finding on exemplary damages cannot form the basis for a judgment.

The judgment entered by the trial court recites that the parties stipulated that ap-

pellee paid appellant the sum of $49,253.41 in interest at a rate in excess of 10 per cent per annum. The judgment then decreed that appellee recover from appellant the sum of $98,506.02 "in accordance with the law of the State of Texas applicable to the charging of usurious interest in the State of Texas."

Paragraph 15 of the loan agreement provides:

"15. This proposal by the Borrower shall not be effective until accepted by an authorized officer of Securities Investment Company of St. Louis at its office in St. Louis, Missouri, whereupon it shall become and be a Collateral Loan Agreement binding on and inuring to the benefits of the Borrower and Lender and their respective successors and assigns, and all transactions thereunder, and all rights and liabilities of the parties shall be governed as to validity, interpretation, enforcement and effect by the laws of the State of Missouri."

■ Where the parties to a contract specify in the instrument that it is to be governed by the law of a particular state, that law will apply if it has a reasonable relationship to the contract. Teas v. Kimball, 257 F.2d 817 (5th Cir., 1958); 16 Am.Jur.2d, Conflict of Laws, § 41, pp. 64–65.

In Dungan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891), the court stated:

" . . . . The doctrine established that a citizen of one state, contracting a debt with a citizen of another, may make the interest according to the law of either, the solution of such a case as the one now before us cannot long be doubtful; for, the contracting parties having the right to enforce their own wishes on the subject, the mere form of manifesting their purpose cannot be treated as of importance. There is no reason why their making their contract in one state instead of in the other, nor why their making it payable in one state instead of

in the other, should have a controlling influence over the question. Doing either will, in the absence of other evidence, serve to show their purpose and control the result. But not so when they otherwise distinctly provide, or when from other facts their intention can be more satisfactorily ascertained. It must be kept in view that usury laws cannot be evaded under cover of naming a state whose laws shall control the contract."

This statement of the law is consistent with that followed in Building and Loan Ass'n of Dakota v. Griffin, 90 Tex. 480, 39 S.W. 656 (1897), where the court said:

"The general rule of law contended for by the loan company, that a contract which is to be performed in a state other than that in which it is made may reserve interest according to the laws of either state, is too well settled to require discussion, or the citation of authority; but the law looks to the substance of the contract, and will not tolerate any contrivance by which it is intended to evade the laws of a state in which the contract is made or sought to be enforced. . . . . "

■ By motion the trial court was requested to take judicial notice of the laws of Missouri concerning usury, and the trial court entered its order granting such motion. Art. 408.030, R.S., Missouri, provides that parties may agree in writing for the payment of interest not exceeding 8 per cent per annum. Art. 408.060, R.S., Missouri, provides:

"Usury may be pleaded as a defense in civil actions in the courts of this state, . . .; provided, however, that no corporation shall, . . ., interpose the defense of usury in any such action, nor shall any bond, note, debt, contract or obligation of any corporation or any security therefor, be set aside, impaired, or adjudged invalid by reason of the rate of interest which the corporation may have paid or agreed to pay hereon."

The effect of this statute is to deny to corporations the protection of the statutes

limiting interest rates. Under the law of Missouri no cause of action to recover usury will be entertained so long as the principal and legal interest remain unpaid. Rukavina v. Accounts Supervision Corp., 237 S.W.2d 503 (Kansas City, Mo., Ct. of App.—Missouri, 1951).

■ The law of the state agreed upon by the parties as governing the contract will not apply if it is established that the agreement was merely a contrivance to evade the Texas usury statute. There was no pleading alleging that this agreement was a subterfuge, and apparently the issue was not developed in a systematic manner by the testimony.

Appellant is a corporation with its office in St. Louis, Missouri, and the contract was made in Missouri. It does not appear that appellant had an office in the State of Texas. The receivables were forwarded to appellant and retained by it at its office. A reasonable relationship between the law of Missouri and the contract is evident in the record. There is no evidence to support an implied finding that the provision of the contract under consideration was inserted merely as a subterfuge or a contrivance to evade the usury laws of Texas.

Appellant contends that the damage appellee sought was shown by the evidence to have resulted, if at all, by reason of appellant's action in undertaking direct collection of the receivables, which action was within its contractual right. The effect on this contractual right of appellant's previous termination of the contract, and demand for full payment, is not developed by the pleadings or in the briefs of the parties.

The judgment must be reversed because of the errors discussed. Other assignments of error were presented, and have not been specifically discussed for the reason that the matters complained of are not likely to recur. The issues are not clearly drawn by the pleadings, but the facts plead, aided by

reasonable intendments, were sufficient to support the special issues submitted. The case has not been fully developed, and in the interest of justice, it is ordered remanded in its entirety.

Reversed and remanded.