Finding no abuse of discretion in the actions of the District Court, we affirm the denial of the petition.

N. K. PARRISH, INC.,
Plaintiff-Appellant,

v.

SOUTHWEST BEEF INDUSTRIES
CORPORATION, Etc., et al.,
Defendants-Appellees.

No. 78–1041.

United States Court of Appeals,
Fifth Circuit.

March 13, 1981.

Robert E. Garner, Lubbock, Tex., for plaintiff-appellant.

George McLachlan, Lamar, Colo., for Southwest Beef Industries, Arizona Nat'l, Delay and Hogan.

J. Orville Smith, Lubbock, Tex., for Bankers AG Credit Corp.

Charles B. Jones, Lubbock, Tex., for Dougherty, Quinn, Bluemle, McFarland, Lacy, B. G. Cattle, Jarvis and Steele.

Before CHARLES CLARK, RONEY and HENDERSON, Circuit Judges.

CHARLES CLARK, Circuit Judge:

N. K. Parrish, Inc., sued to recover payments on contracts for the purchase of grain. The primary issue on appeal is whether a group of individual taxpayer-investors in a cattle feeding program sponsored by Arizona National Cattle Company is liable to Parrish for grain purchased from Parrish by Arizona National and assigned to the feeding program. We conclude that the investors are liable and that Parrish can elect on appeal to have judgment against them rather than against their agent, Arizona National.

## I. FACTS

In October and November of 1974, Arizona National and Southwest Beef Industries Corporation contracted with Parrish to purchase some eleven million pounds of feed grain. Southwest Beef acted as agent for Arizona National in executing five contracts. A small quantity of the grain was delivered and paid for under the contracts, but in December 1974 Arizona National no longer could fulfill its part of the agreements. It contacted Parrish and, sometime before December 31, 1974, the parties agreed upon renegotiated contract terms. In particular, the renegotiated contract was conditioned upon a $25,000 deposit from Arizona National to Parrish. The deposit was made in January of 1975, and the document embodying the renegotiated contract was prepared by Parrish, and dated January 23, 1975.

In December 1974, while Arizona National was renegotiating its grain contract with Parrish, it entered into agency agreements with a group of individual investors. Under Arizona National's "Managed Cattle Feeding Program," individual investors paid Arizona National to acquire, raise, and sell cattle on their behalf. Each participant in the program executed an agency agreement under which Arizona National was entitled to exercise all functions required for the program, including the power to incur debts on the investors' behalf. The prospectus issued by Arizona National advised investors that they might be able to

obtain substantial tax advantages under this arrangement, including deductions for the cost of feed purchased in advance of need, but, as also pointed out by the prospectus, the profitability of the cattle feeding program itself was problematical. The agency agreement included an optional indemnification term, under which an investor could limit his personal liability, but no investor took advantage of this provision.

In late January 1975, Arizona National persuaded Parrish to back date the renegotiated grain purchase contract to December 31, 1974. In its capacity as agent for the individual investors under the cattle feeding program, Arizona National assigned to each investor a portion of the renegotiated grain purchase contract. Each investor deducted his portion of the Parrish feed grain contract cost on his 1974 tax return. Ultimately, however, Arizona National was unable to accept delivery of, or pay for, the feed grain purchased from Parrish. Parrish sued to recover its damages under the breached contract from Arizona National and, when it learned of their identity, from the individual investors.

The case was tried without a jury, and the district court entered extensive findings. The court found that the investors were interested in the cattle feeding program primarily for its 1974 tax advantages, and that the investors were undisclosed principals who had conferred limited powers of agency on Arizona National. Because the original grain deal was struck before the investors appointed Arizona National as their agent, and because the renegotiated contract was finalized after the 1974 tax year had expired, the court ruled that Arizona National had no authority to make the grain purchases on the investors' behalf. The trial court also found that the investors' potential liability under the cattle feeding program was limited to the amount of their initial investment, approximately $6500 in most cases. Based on these findings, the trial court entered judgment for Parrish against Arizona National for the full amount of contract damages, but ordered that Parrish was to take nothing from the investors.

## II. PAROL EVIDENCE

The trial court found that "it was the understanding of all the parties in the cattle feeding program that the individual investors would have no liability in excess of the $6,500 per unit." The court concluded that, because of this limitation, the investors could not be responsible for Parrish's contract damages. It is apparent, however, that the trial court's finding is based wholly on parol evidence. The agency agreement signed by each investor explicitly provides that "[i]t is agreed and understood that Arizona National in no way participates in, nor is liable for, any Net Loss upon the sale of the unit(s)." Moreover, the prospectus describing the cattle program to potential investors includes on its cover the following warning, printed in large type: "This offering involves a high degree of risk . . . [A]n owner, because of the high proportion of borrowings in a program, should be prepared to incur a substantial loss in excess of his cash investment." As if these provisions alone were not dispositive, the prospectus continued, with remarkable clairvoyance, to caution that

> [s]ince the legal relationship between each Owner and the Company is that of principal and agent . . . an owner is personally liable (to an unlimited extent) for all obligations incurred on his behalf by the Company within the scope of its authority under the Agreement. For instance, if the Company were to misapply an Owner's funds and fail to pay feed bills incurred for the Owner's cattle, the Owner may be personally liable to the feedlot operator for the payment of those bills.

Thus, the written agreements, as executed without the optional indemnification, are free from ambiguity. The investors were exposed to liability far in excess of their initial $6500 investment.

 Texas law on the use of parol evidence is equally unambiguous. In *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 32 (1958), the Texas Supreme Court made clear that a written contract is presumed to embody the entire agreement

between the parties. Previous or inconsistent agreements, whether oral or written, are inadmissible to vary the terms of the written contract. *Id.* Recent Texas cases reaffirm this rule. *See, e. g., Lakeway Co. v. Leon Howard, Inc.*, 585 S.W.2d 660, 662 (Tex.1979); *Texas Export Development Corp. v. Schleder*, 519 S.W.2d 134, 137 (Tex. Civ.App.1974, no writ). The investors urge that their limitation of liability "understandings" were collateral agreements, or agreements which induced the written contracts, and, under Texas law, are considered exceptions to the parol evidence rule, *e. g., Lakeway Co. v. Leon Howard, Inc., supra,* 585 S.W.2d at 662; *Anderson v. McRae*, 495 S.W.2d 351, 360–61 (Tex.Civ.App.1973, no writ). No such limitation of an investor's liability could be collateral. It would directly conflict with the unambiguous terms of both the agency agreement and the prospectus, and the trial judge erred in considering such evidence. We hold that the agreement and the prospectus are the complete and exclusive expression of the agency relationship between the investors and Arizona National, and that the investors were subject to liability in excess of the $6500 unit price.

## III. ELECTION ON APPEAL

█ Parrish asks us to find that the investors are liable for the contract damages. There has been no appeal from the judgment against Arizona National, however, and thus Parrish's right to recover all the damages from Arizona National is, at least theoretically, intact.[1] The investors argue that Parrish has elected to proceed against the agent, and is precluded under Texas law from seeking an additional judgment against the principal.[2]

It is elementary that an aggrieved third party cannot recover full damages both from an undisclosed principal and from the agent. *See* Restatement (2d) of Agency

§ 210(1) (1957). This principle is fully recognized in Texas law. *See Moody-Seagraves Ranch, Inc. v. Brown*, 69 S.W.2d 840, 844 (Tex.Civ.App.1934, writ ref'd); *Diacomis v. Wright*, 20 S.W.2d 139, 140 (Tex.Civ. App.1929), *aff'd in part, rev'd in part on other grounds*, 34 S.W.2d 806 (1931). Recent Texas cases, however, evince a subtle approach to the question of when the plaintiff must choose between agent and principal. *Sherrill v. Bruce Advertising, Inc.*, 538 S.W.2d 865, 867 (Tex.Civ.App.1976, no writ), might be read to hold that any judgment against the agent bars proceedings against the principal. The *Sherrill* trial court found that both the agent and the principal were liable as joint venturers. Only the principal appealed. The appellate court ruled, not only that there was no joint venture liability, but also that the principal could not be liable under agency doctrine because a judgment against the agent already had become final. According to the court, "[o]n the theory of principal and agent, the principal . . . cannot now be held liable since there is a final judgment had against its agent for breach of the contract." *Id.* at 867.

By contrast, in *Medical Personnel Pool of Dallas, Inc. v. Seale*, 554 S.W.2d 211, 214 (Tex.Civ.App.1977, writ ref'd n. r. e.), the court permitted a third party to elect between principal and agent on appeal, even though the third party had accepted judgment against the principal in the trial court. As the court explained in denying the motion for rehearing, "[a]n election by a party contemplates a freedom by that party to choose [the] defendant against whom it desires judgment." *Id.* at 215. Because the trial court had made the election for the third party, by attributing full liability to the principal and none to the agent, the court of civil appeals held that the third party was entitled to elect on appeal to take his judgment against the agent instead.

---

1. We are advised by counsel that Arizona National is bankrupt. As a practical result, Parrish's judgment in the trial court has doubtful value.

2. In this diversity case, of course, we are bound to apply the laws of the forum state. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58

S.Ct. 817, 822, 82 L.Ed. 1188, 1194 (1938). While there is some suggestion that Arizona law should apply to the agency agreement, see note 3, *infra*, the issue of electing between principal and agent is outside the agreement itself, and thus is governed by the law of the forum.

It is difficult to reconcile the *Sherrill* and *Medical Personnel Pool* opinions. In *Sherrill*, the third party was not permitted to pursue the principal on appeal when both principal and agent were found liable in the trial court. In *Medical Personnel Pool*, the third party was permitted to pursue the agent on appeal, even though the agent enjoyed an express ruling of nonliability by the trial court. Because Texas has no procedure for certification, it is our duty, in this diversity case, to choose which authority is to be applied to the facts here.

The case before us is virtually indistinguishable from *Medical Personnel Pool*. In that case, as in this one, an agent acting on behalf of an undisclosed principal contracted with a third party. In both cases the third party brought suit against both the agent and the undisclosed principal. In neither case did the trial court require that the plaintiff elect to sue one or the other. After trial, the court in each case erroneously ruled that one party was immune from liability. In *Medical Personnel Pool*, the court granted the agent's motion for a judgment *non obstante veredicto*. In our case, the district court ruled that the principals—the investors—were immune from liability. When confronted with this scenario on appeal, the Texas court in *Medical Personnel Pool* held that the trial court's error prevented the plaintiff from making a voluntary election, and that the party was entitled to elect on appeal. By the same token, we believe that, under Texas law, Parrish is entitled to elect recovery against the principals in the present case.

While *Sherrill* also is similar in many respects to the case before us, the opinion in

that case devotes only cursory attention to the election issue. In *Sherrill*, the undisclosed agency theory was advanced for the first time on appeal, and formed no part of the trial court's decision. By contrast, in this case and in *Medical Personnel Pool* the agency theory of liability was fully developed at trial. More important, the *Sherrill* court merely recited the rule prohibiting double recovery and applied it to the facts before it without analysis of the rationale for the rule. The possibility of an election on appeal was not discussed. In *Medical Personnel Pool*, on the other hand, the court clearly stated that the election rule required a voluntary act of will on the part of the third party. Because the *Medical Personnel Pool* court articulated this rule and applied it to facts identical to those now before us, we conclude that we are bound to apply it in this case.

## IV. SCOPE OF AGENCY

Any liability of the investors for the grain purchases from Parrish must arise from the agency relationship between Arizona National and the investors. The trial court found that the investors were undisclosed principals in the feed grain transactions between Parrish and Arizona National. Although Parrish asserts instead that the investors were partially disclosed principals, the finding of the court below is not clearly erroneous.

 Under Texas law,[3] an undisclosed principal is liable for contracts made by his agent as long as the agent is acting within the scope of his authority. *See, e. g., Medi-*

---

**3.** The parties and the trial court have interpreted the agency agreement under Texas law. The agreement itself, however, provides that "[t]his Agreement is to be deemed executed under and to be construed and governed by the laws of the State of Arizona." Texas choice of law doctrine, which we are bound to apply under *Erie Railroad Co. v. Tompkins, supra,* recognizes the right of parties to a contract to choose the law that will govern their contractual relationship, as long as the forum whose law is chosen has a reasonable relationship to the

subject matter of the contract. *See, e. g., Dowling v. NADW Marketing, Inc.,* 578 S.W.2d 475, 476 (Tex.Civ.App.1979, writ ref'd n. r. e.); *Securities Investment Co. v. Finance Acceptance Corp.,* 474 S.W.2d 261, 271 (Tex.Civ.App. 1971, writ ref'd n. r. e.). Thus, it might appear that Arizona law, not Texas law, should have determined the extent of Arizona National's agent authority. Because neither party raised or briefed this issue on appeal, we assume Texas law should apply.

*cal Personnel Pool of Dallas, Inc. v. Seale,* 554 S.W.2d 211, 213 (Tex.Civ.App.1977, writ ref'd n. r. e.). Moreover, the principal may be liable, even when the agent acts without authority, when the principal retains the benefits of the transaction. *Owen v. King,* 84 S.W.2d 743, 749–50 (Tex.Civ.App.1935) *rev'd on other grounds,* 130 Tex. 614, 111 S.W.2d 695 (1938). Thus, if Arizona National had authority under the agency agreement to purchase grain from Parrish on the investors' behalf, or if the investors retained the benefits of the transaction, then the investors are liable to Parrish. We hold that the investors are liable under either theory.

■ There can be little question that Arizona National had authority, at least for some period of time, to purchase cattle and feed grain for the investors. The entire purpose of the cattle feeding program was for Arizona National to acquire, feed, and market the investors' cattle. The agency agreement signed by the investors, and the offering prospectus, make Arizona National's authority in this regard incontrovertibly clear.

The investors point out, however, that Arizona National initially purchased the feed grain from Parrish several weeks before the first investor signed an agency agreement. They argue that, whatever authority Arizona National enjoyed after the agency agreement was signed, it had no authority prior to that time. Moreover, the investors note that the renegotiated grain purchase contract was finalized on January 23, 1975. Because the purpose of the cattle feeding program was to provide the investors with tax deductions for 1974, the investors argue that grain purchases after the end of the year also were beyond Arizona National's authority. Thus, although the investors must concede that the agency agreement authorized Arizona National to purchase grain for the investors, they argue that the grain purchased from Parrish was purchased too early and renegotiated too late to come within Arizona National's authority.

While the investors' argument is not unappealing, it proves, if anything, too much. The investors would have us believe that Arizona National could purchase no grain for them before they entered the cattle feeding program or after the end of the year. But it is apparent from a practical standpoint that the managed cattle feeding program depended on advance purchases of grain. The principal attraction of the program from the investors' standpoint was its 1974 tax advantages. Yet no investor entered the program until December 6, and at least two investors waited until December 31 to sign the agency agreement. In view of the logistical complexities of acquiring and feeding a large number of cattle, the investors could hardly have expected that all purchases would be made in the short period between the signing of the agency agreement and the end of the year. They must have known that some advance preparations would be made.

Moreover, as Parrish points out, the agency agreement explicitly recognized the possibility of advance purchases of grain. The prospectus provided that

> [t]he Company, as agent for the Owner, may engage in the advance purchases of feed and feed grains to be fed to cattle involved in each program.... It must be pointed out that, while such advance purchasing usually results in advantageous bulk prices, it may and has, in some instances, resulted in an Owner paying more for such feed than might be the case if purchases were not made until the feed was required by the Owner's cattle.

It is true that this extract from the prospectus may be intended to refer to "advance" purchases only in the sense that they are in advance of consumption by the cattle, and not in advance of the entry of the investors into the program. Nevertheless, the inherent ambiguity of the provision should have warned investors that there was a potential for loss occasioned by purchases of grain which had to be made in 1974 before they joined the program.

Equally important, the investors received and retained precisely what they sought from the managed cattle feeding program. The prospectus and agency agreement make clear that an eventual profit from marketing the cattle was far from assured. Indeed, charts included in the prospectus indicated that, in the previous year, only four out of thirteen investors sold their cattle for more than it cost to buy them, raise them, and bring them to market. Thus, the prime attraction of the program was its tax consequences. Under the program designed by Arizona National, each investor who paid the $6500 unit price was entitled to a deduction of between thirty and forty thousand dollars.[4] Each investor sued by Parrish in this case deducted the cost of the advance grain purchases from it on the investor's federal income tax for 1974. No investor renounced the tax advantages that accrued to him because of Arizona National's dealings with Parrish. Nevertheless, by contesting liability for Arizona National's contract with Parrish, they seek to disavow the economic realities that brought them those very tax advantages.

The investors argue that, whether or not Arizona National was authorized to purchase grain for them prior to their entry into the program, their agent should not be allowed to engage in self-dealing. They contend that the assignment to them of grain purchase contracts in which Arizona National had a loss constituted such self-dealing. The loss-shifting effect of such an assignment might be controlling in an action between principals and a false agent, but it has no bearing on the issue of the investors' liability to Parrish. Self-dealing by the agent cannot relieve an undisclosed principal of his obligations to a third party. Both Parrish and the investors reposed confidence in Arizona National. Loss must befall one or the other. The investors cannot avoid contractual obligations to Parrish

which were renegotiated and transferred for their benefit and from which they, in fact, derived the intended benefit. The fact that some other timing of feed grain purchases may have been more advantageous does not affect their liability to Parrish.

We hold that the investors are liable to Parrish on the grain contracts because Arizona National had actual authority to purchase the grain for the investors, and because the investors received and retained the benefits of the transaction made in their behalf. Parrish has represented to this court that as between Arizona National and the investors, it elects to have judgment against the latter. Accordingly, the judgment against Arizona National is vacated and the judgment in favor of the investors is reversed. The case is remanded to the district court with instructions to enter judgment in favor of Arizona National as against Parrish and in favor of Parrish as against the investors, the district court to determine, under applicable law, the amount of liability of each investor.

## V. BANKERS AG

■ Parrish asserts that Bankers Ag Credit Corporation also is liable for the grain contracts. Arizona National assigned the Parrish grain contracts to Bankers Ag as part of a financing arrangement designed to ensure that the debts corresponding to the grain purchases were dated in 1974 and that the investors, as a result, would be entitled to 1974 tax deductions. The assignments specifically provided, however, that Bankers Ag agreed to pay for the grain "as the commodity is consumed." Because no grain ever was consumed under the program and Bankers Ag had no agency relationship to Parrish, we affirm the trial

---

4. The $6500 unit price was used to purchase cattle and to pay Arizona National's fee. Feed grain expenses, totaling as much as $40,000, were met by funds borrowed against a security interest in the cattle. Under tax law existing at the time, a cattle owner who used the cash basis method of accounting could deduct the cost of feed grain purchased in the current year despite the fact that the grain would be delivered and consumed in a future year.

court's ruling that Bankers Ag bears no responsibility for payments on the grain contracts.

AFFIRMED IN PART and REVERSED IN PART.

HENDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur and agree with that portion of the panel opinion holding that Parrish might have pursued the investors instead of Arizona National and, having done so, could have recovered from them.[1] Contrary to the view of the majority, however, I do not believe that Parrish had the right to make that election on appeal. Parrish's notice specifically limited its appeal to "that portion of the judgment ... providing that plaintiff take nothing as against Bankers Ag [and the named investors]." Parrish did not request leave to amend its notice of appeal, or offer to free Arizona National, until after oral argument, by which time the parameters of the investors' argument were well set. Parrish had its reasons for appealing only part of the judgment of the district court, and it should be bound by its decision. F.R.A.P. 3(c) and 26(b).

The Texas decisions are inconsistent in their approach to the question of when a seller must decide whether to hold a principal or his agent. Yet, with the exception of *Medical Personnel Pool of Dallas, Inc. v. Seale*, 554 S.W.2d 211 (Tex.Civ.App.1977), they all say that the choice must be made before entry of judgment. *Cf. Fort Terrett Ranch Co. v. Bell*, 275 S.W. 81, 83 (Tex.Civ. App.1925) (election permitted when both agent and principal appeal).

Some of the reported opinions conclude that a seller cannot name both principal and agent in a single action, but must elect which to sue. *Heffron v. Pollard*, 76 Tex. 96, 11 S.W. 165, 166 (1889) ("a plaintiff cannot sue both; he must make his election."); *Diacomis v. Wright*, 20 S.W.2d 139, 140 (Tex.Civ.App.1929), *rev'd in part on other grounds*, 34 S.W.2d 806 (Tex.1931) ("either, but not both, may be sued for a

breach"); *Nail v. Boothe*, 265 S.W. 1051 (Tex.Civ.App.1924) ("the plaintiff cannot recover against both the agent and undisclosed principal, but must elect which he will sue"). Other cases recognize a single action against both principal and agent, but enunciate "the rule that the seller may sue both the agent and the undisclosed principal, and at his option may, before judgment, elect to hold the undisclosed principal liable by taking a nonsuit as against the agent." *Owen v. King*, 84 S.W.2d 743, 750 (Tex.Civ.App.1935); *accord, Veazie v. Beach Plumbing & Heating Co.*, 235 S.W. 695, 697–98 (Tex.Civ.App.1921); *Pittsburg Plate Glass Co. v. Roquemore*, 88 S.W. 449, 450 (Tex.Civ.App.1905).

The majority focuses on two recent Texas cases from intermediate appellate courts, *Medical Personnel* and *Sherrill v. Bruce Advertising, Inc.*, 538 S.W.2d 865 (Tex.Civ. App.1976), that "evince a subtle approach to the question of when the plaintiff must choose between agent and principal." Ante, at 1369. These cases cannot really be reconciled. None of the distinctions that might be drawn were significant to the reasoning of the courts, and I do not understand the majority to find one case more in point than the other. Rather, as the majority candidly points out, our task is to choose which to follow. In my opinion, *Sherrill* conforms to the well-established Texas jurisprudence that a seller's decision to appeal only part of a judgment is a constructive election.

In *Sherrill* an advertising company sued a real estate developer for breach of contract. When the plaintiff learned the developer had been acting as agent for the trust that owned the real estate, the trustee was joined as a defendant. After the trial judgment was entered against both defendants on a joint venture theory, only the trustee appealed. The Court of Civil Appeals held that there had been no joint venture. The court went on to "imply" that the trustee was the undisclosed principal of the devel-

---

1. I also adhere to the majority's conclusion that Bankers Ag was not liable on the grain contracts.

oper, but concluded that since the plaintiff had not appealed the judgment against the agent it could no longer elect to look to the undisclosed principal for payment.

> An undisclosed principal is discharged from liability upon a contract if, with knowledge of the identity of the principal, the other party recovers judgment against the agent who made the contract, for breach of the contract. Restatement (Second) of Agency § 210(1) (1957). While this rule has received some discredit (*See* Merrill, *Election Between Agent and Undisclosed Principal: Shall we follow the Restatement?* 12 Neb.L.V. (1933)), the Texas courts have consistently followed it. 31 Tex.Dig. Principal & Agent § 145(4) (1974). Here, the judgment against the agent Crane-Maier has become final. On the theory of principal and agent, *the principal*, Sherrill Trust, *cannot now be held liable since there is a final judgment had against its agent* for breach of the contract.

538 S.W.2d at 867 (emphasis supplied); *see also Sherrill v. Ray*, 538 S.W.2d 867 (Tex. Civ.App.1976) (related case).

In *Medical Personnel* a woman (the agent) obtained nursing care from the plaintiff for her mother-in-law (the principal). After the bill became past due, the plaintiff sued both women. The jury, on special interrogatories, found that any agency between the women was undisclosed. The trial judge granted judgment in favor of the daughter-in-law. The Court of Civil Appeals held that it was error to grant the judgment n. o. v., and that, consequently, the nursing service had a right to elect on appeal which defendant to hold liable (citing *Sherrill*). 554 S.W.2d at 214. On rehearing, the daughter-in-law maintained that the plaintiff made its election when it accepted judgment against her mother-in-law. 554 S.W.2d at 215. The court rejected this argument, saying that the trial judge, and not the plaintiff, made the election by granting the daughter-in-law a judgment after the jury found facts to support relief against her. The appeal was from that very decision of the trial

judge, and from that decision only. In other words, the plaintiff never made an election, since an election "contemplates a freedom by that party to choose," which freedom the trial judge denied the plaintiff. *Id.*

The majority discounts *Sherrill* as giving "only cursory attention to the election issue," and says "the *Sherrill* court merely recited the rule prohibiting double recovery." Ante, at 1370. If that be true, it is because it was written before *Medical Personnel*, when the Texas law was clear.[2] The court did not rely on the rule against double recovery, but rather the "consistently followed" Texas mandate that recovery of judgment against an agent discharges his principal. If either opinion is short of analysis, it is *Medical Personnel*, which ignores the previous Texas decisions and fails to cite any case permitting election on appeal.

When state law controls an issue in a diversity case, a federal court must look to the pronouncements of the state's highest court for guidance. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). The only relevant opinion of the Supreme Court of Texas is *Heffron*, which would prevent Parrish from even suing both Arizona National and the investors. *Heffron* is an old case, albeit one that is repeatedly cited by the lower courts, and were it clear that the Supreme Court of Texas would reach a different conclusion if faced with the question today, we might be free to ignore it. *Bosch; Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 205–12, 76 S.Ct. 273, 278–280, 100 L.Ed. 199, 207–210 (1956) (J. Frankfurter, concurring). But the Supreme Court of Texas has not reversed *Heffron* even though it has had numerous opportunities. With the exception of *Medical Personnel*, "there appears to be no confusion in the ... cases, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of ... judges on the question [and] no legislative development that promises to undermine the judi-

---

**2.** This conclusion is buttressed by the court's citation to the *Texas Digest.*

cial rule." *Bernhardt,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. at 206.

*Sherrill* is also consistent with the rationale behind the election rule. Although *Medical Personnel* holds that the essence of an election is free choice, the reason a plaintiff is put to an election at all must be found in the opinions that developed the rule. In making his contract the seller was looking to the credit of only one person—by definition the agent—and the cases reflect the view that if the seller switches his attention to the principal, of whose existence he was unaware when he entered the contract, he should then only be permitted to hold the principal responsible. *See, e. g., Heffron.*

The Restatement observes that there is no entirely satisfactory explanation for the rule, and that it is "inconsistent with the basic reason underlying the liability of the undisclosed principal," and perhaps even "unjust." Restatement, Second, Agency § 210, comment *a. Cf.* Williston on Contracts § 289 (3d ed. 1959). In fact, the election rule met with wide-spread approval in Texas partly because of dissatisfaction with the logic underlying the liability of an undisclosed principal, and, just or not, it is clear that Parrish had more time than the rule contemplates to make its choice.

The Restatement's treatment of judgments against partially disclosed principals provides a useful comparison which supports the approach of *Sherrill* and the older Texas cases. "Recovery of judgment against the agent of a disclosed or partially disclosed principal ... does not thereby discharge the principal ..." Restatement, Second, Agency § 184(1). The comment on this subsection points out that a seller loses his rights against the principal when he "gets" a judgment against the agent after discovering the identity of an undisclosed principal, comment *a,* but only *"satisfaction of the judgment against the agent terminates the liability of the [partially disclosed] principal,"* comment *c* (emphasis supplied).[3] Other jurisdictions have noted this distinc-

tion, and held that while only the satisfaction of a judgment against the agent of a partially disclosed principal will constitute an election, in actions involving undisclosed principals such a constructive election occurs prior to satisfaction of the judgment. See the discussion in *Clifton Cattle Co., Inc. v. Thompson,* 43 Cal.App.3d 11, 117 Cal. Rptr. 500, 503–04 (1974).

For the foregoing reasons, I respectfully dissent.

---

**3.** The comment observes that the election rules on disclosed and undisclosed principals are "not in accord."